## LINAN v. UNITED STATES.

### No. 13404.

United States Court of Appeals
Ninth Circuit.

March 16, 1953.

J. B. Tietz, Los Angeles, Cal., for appellant.

Walter S. Binns, U. S. Atty., Ray H. Kinnison, Asst. U. S. Atty., and Richard F. Hayden, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before STEPHENS, HEALY, and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

Rudy Valentino Linan went through all of the stages of the Selective Service Act of 1948, now Universal Military Training and Service Act, 50 U.S.C.A.Appendix, § 451 et seq., but refused to be inducted. The Grand Jury indicted him under 50 U.S.C.A. Appendix § 462 and the trial court found him guilty. This appeal is from the judgment subsequently entered.

[1] Appellant words the two "questions presented" in the appeal, as follows:

1. "May the eligibility of a selective service registrant professing to be a conscientious objector for a claimed classification be judged on any basis other than his own facts? More specifically, may it be judged in large part, even if not entirely, on the beliefs of the church his parents belong to or that he attended?"

The question posed erroneously assumes situations not in the case. Of course, the Local Board and all persons having to do with a classification subsequent to the Board's classification must determine from the evidence whether the registrant " * * * by reason of religious training and belief, *is* (emphasis ours) [1] conscientiously opposed to participation in war in any form." 50 U.S.C.A.Appendix, § 456(j). The inquiry all along the line was exactly that. The record shows conclusively that the matter of church affiliation and association was but one of the phases inquired into as to registrant's religious training and its relation to registrant's asserted claim of a conscientious objector. There is no merit to Question One.

Question 2: "Is a selective service registrant denied due process when the Advisory Report of the Hearing Officer is both factually incorrect and based on the supposed nonpacifist beliefs of his parents' church and churches he has attended?"

We have disposed of the last half of this question in our treatment of Question One. It goes without saying that an Advisory Report could be so incorrect factually as to vitiate its usefulness, but we have no such situation here.

The proceeding before the Board and the Board's report were transmitted to the Hearing Officer. By these data it appears that Linan registered on September 17, 1948, and made no claim as a conscientious objector. On August 3, 1950, he was classified I-A and was notified that he might request postponement of induction to finish high school. Later he was ordered to report for his "physical", but two days before he had officially presented his claim for exemption as a conscientious objector. There was absolutely nothing in the testimony before the Board supporting his claim as a conscientious objector or that he was such by reason of religious training, except his own statements of his belief and that he had been helped to clarify his mind by an associate who was a conscientious objector and by the teachings of the Ten Commandments. The Board inquired into registrant's religious background and came to the conclusion that registrant had not met the conscientious objector qualifications.

At the trial in the district court, registrant was queried as to his answers to the Hearing Officer and we quote this examination in the margin.[2] Registrant merely

---

1. See Saunders v. United States, 9 Cir., 1946, 154 F.2d 872–873.

2. Mr. Linan took the stand and was questioned by his attorney regarding the correctness of the Hearing Officer's report. The applicable examination was as follows (page 44 et seq., Transcript of Record on Appeal):

"The Witness: Thank you. He asked me if at the time I had registered for this classification, if there was any Korean war on, and I told him there wasn't, and he said he was trying to phrase it so that if I said there wasn't any war, the way he wrote it down, they put it down because of that reason I had gone into that classification.

"Q. By Mr. Tietz: Now, a line or two further, there is something else about the Korean war. Did you make that remark?

* * * * * *

"Q. By Mr. Tietz: 'At his hearing when he was asked to explain why he had not claimed as being a conscientious objector in 1948, he said there was no rea-

gives a different slant to a few of his answers. The difference, whatever it was, was before the court. Question Two is without merit.

■ The registrant was accorded full due process, and the Hearing Officer's conclusion, which is as follows, was sustained by the evidence:

"It is the conclusion of this Hearing Officer that while registrant is generally a boy of good character, good habits, and comes from a fine family, there is no religious background and no influence by his church or his parents, nor from any other source that had led him to his present stand as a conscientious objector. It is the belief of this Hearing Officer that registrant has rather recently become obsessed with a fear of entering the Army, but that there is no basis whatever for exemption as a conscientious objector. It is therefore Recommended that registrant should not be classified as I-A-O or IV-E."

Affirmed.

son for it; that there was no Korean war at that time.'
"Was that your statement? A. No.
"Q. What did you say? A. He asked me if there was a war on at the time I had asked for that specific classification and I told him no.
"Q. He goes on to say in the report that he, referring to you, does not think that the Korean war will do anyone any good.
"Did you make that statement? A. That is part of what I said.

\* \* \* \* \* \*

"Q. Now, what did you mean when you told Mr. Files, if you did, that you never gave public expression to your beliefs until recently when you wrote a high-school paper? A. He mentioned did I go around telling people what I believed in, and that I was a conscientious objector.
"Q. But did you discuss that with him? A. What do you mean?
"Q. Did you tell him that you had told people? A. I told him I hadn't gone around publicly telling everybody what I was.
"Q. Now, turning over further on concerning your conversation with Mr. Files on the basis of your belief, the report says, 'He didn't get his beliefs from the Bible but it is just his own personal belief.'
"Now, what is the fact of your discussion with Mr. Files on that? A. I took part of my beliefs from the Bible and the Ten Commandments.
"Q. And then his report said, 'Admits that he has told friends that "I want to go into the military service" and that when some of his friends entered the Army he stated to them "I will be with you before long".'
"Was that the content of your discussion with Mr. Files? A. He was trying to tell me—he asked me if I had said that and I told him I hadn't.
"Q. Mr. Files' report said in quotes, ' "I didn't know that anything could be done about keeping out of the Army." '
"What was your discussion on that point? A. I didn't say that. I told him that there was many a form that I had known about at the time to file as a conscientious objector. That is what I told him.
"Q. Several lines farther down on this report he has you saying that you had come to your beliefs fairly recently. Now, what had you told him about that? A. I told him recently—about five or six or seven years.
"Q. Now, he discusses here about your employment—that your employer didn't know of your views on conscientious objection. What was said on that point? A. He asked me if I had told him I was a conscientious objector, and I told him no.
"Q. Did you give him any reason? \* \* \* A. Well, it might imperil my job. He might not have hired me. He might have had a different viewpoint.
"Q. The report quotes you as having said to some people, to some friends, 'I will be with you before long,' young friends who had gone into the Army. A. I said 'I will see you around', or 'I will be seeing you', or something like that, but I never said, 'I will be seeing you before long.' When they came back was what I meant.
"Q. Farther down, after quoting some similar statements, the report says that at the hearing you admitted making those statements. A. I told him just what I told you.
"Q. Did you discuss with Mr. Files your religious background? A. Part.
"Q. Did he ask questions concerning what denomination if any, your parents belonged to? A. Yes, sir.
"Q. Did he discuss with you what churches you had attended, if any?"
The record discloses no answer to this question.