## UNITED STATES *v.* NUGENT.

NO. 540.

Argued May 1, 4, 1953.—Decided June 8, 1953.

*Robert W. Ginnane* argued the cause for the United States. With him on the brief were *Acting Solicitor General Stern* and *Beatrice Rosenberg.*

*Hayden C. Covington* argued the cause for respondents. With him on the brief was *Herman Adlerstein.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

Section 6 (j) of the Selective Service Act[1] provides exemption from military service—partial or full, depending upon the circumstances—for any person "who, by

___

[1] Section 6 (j) appeared in the 1940 Selective Service Act as § 5 (g), 54 Stat. 885, 889. It was reenacted as § 6 (j) of the Selective Service Act of 1948. 62 Stat. 604, 613, 50 U. S. C. § 456 (j). The Act was

reason of religious training and belief, is conscientiously opposed to participation in war in any form." If the conscientious objector's claim for relief under this Section is denied by his local draft board, he is entitled to further review by an "appropriate appeal board." All such appeals are referred to the Department of Justice for an "appropriate inquiry" and a "hearing." The Department of Justice then makes a recommendation to the appeal board, which may or may not follow it in reviewing the local board's classification.

---

amended in 1951, 65 Stat. 75, 86, 50 U. S. C. App. (Supp. V) § 456 (j), and the present language of § 6 (j) differs in immaterial respects from the language in the earlier statutes.

The full text of § 6 (j) of the Selective Service Act of 1948 reads:

"Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code. Any person claiming exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the armed forces under this title, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, be deferred. Any person claiming exemption from combatant training and service because of such conscientious objections shall, if such claim is not sustained by the local board, be entitled to an appeal to the appropriate appeal board. Upon the filing of such appeal, the appeal board shall refer any such claim to the Department of Justice for inquiry and hearing. The Department of Justice, after appropriate inquiry, shall hold a hearing with respect to the character and good faith of the objections of the person concerned, and such person shall be notified of the time and place of such hearing. The Department of Justice shall, after such hearing, if the objections are found to be sustained, recommend to the appeal board that (1) if the

4

These two cases are concerned with the procedure, established by regulation and practice,[2] which is followed when a conscientious objector's appeal is referred to the Department of Justice. The Department has regularly used the FBI to investigate each appealing registrant's background and reputation for sincerity. A hearing is then held before a designated "hearing officer." The registrant is allowed to appear in person, and, if he chooses, he may bring with him an advisor and witnesses to testify in his behalf.[3] Upon request, he is entitled to be instructed "as to the general nature and character" of any "unfavorable" evidence developed by the Depart-

objector is inducted into the armed forces under this title, he shall be assigned to noncombatant service as defined by the President, or (2) if the objector is found to be conscientiously opposed to participation in such noncombatant service, he shall be deferred. If after such hearing the Department of Justice finds that his objections are not sustained, it shall recommend to the appeal board that such objections be not sustained. The appeal board shall, in making its decision, give consideration to, but shall not be bound to follow, the recommendation of the Department of Justice together with the record on appeal from the local board. Each person whose claim for exemption from combatant training and service because of conscientious objections is sustained shall be listed by the local board on a register of conscientious objectors."

There is a dearth of legislative history reflecting discussion in Congress about this phase of the Selective Service Act. The problem was discussed rather briefly during the Committee hearings on the 1940 Act. See Hearings Before the Committee on Military Affairs United States Senate on S. 4164, 76th Cong., 3d Sess., and Hearings Before the Committee on Military Affairs House of Representatives on H. R. 10132, 76th Cong., 3d Sess. Compare H. R. Rep. No. 2903, 76th Cong., 3d Sess., p. 5.

[2] See 32 CFR § 1626.25 (1949 ed.); see also 17 Fed. Reg. 5449, June 18, 1952.

[3] See, Instructions to Registrants Whose Claims for Exemption as Conscientious Objectors Have Been Appealed (a letter sent to the appealing registrant from the office of the Attorney General) reproduced in part in the record in the *Nugent* case, at p. 54.

ment's investigation.[4] But he is not permitted to see the FBI report, nor is he informed of the names of persons interviewed by the investigators.

It is the Department's refusal to disclose the entire FBI reports which precipitates the issues now before us. The Court of Appeals for the Second Circuit has held that this procedure violates a registrant's rights under the Selective Service Act.[5] We granted certiorari, 345 U. S. 915, because that determination seemed in conflict with the decisions of other Courts of Appeals[6] and because it dealt with an important problem in the administration of the Selective Service Act.

Each of the respondents claims to be a conscientious objector entitled to total exemption from military service. Each has been convicted of wilfully refusing to submit to induction in the armed forces of the United States.[7] At their trials, respondents challenged the validity of their selective service classifications, claiming that they were fixed without basis in fact[8] and without adherence to the procedures prescribed by § 6 (j) of the Act;[9] each claimed that the Department of Justice's failure to show him the FBI reports rendered his classification illegal. The Court of Appeals, reversing each respondent's conviction, sustained the claims.

We think that the Court of Appeals erred. We think that the statutory scheme for review, within the selective service system, of exemptions claimed by conscientious

---

[4] *Ibid.*

[5] *United States* v. *Nugent,* 200 F. 2d 46, and *United States* v. *Packer,* 200 F. 2d 540.

[6] See *e. g., Imboden* v. *United States,* 194 F. 2d 508 (C. A. 6th Cir. 1952); *Elder* v. *United States,* 202 F. 2d 465 (C. A. 9th Cir. 1953).

[7] 50 U. S. C. App. (Supp. V) § 462.

[8] *Cox* v. *United States,* 332 U. S. 442 (1947).

[9] *Estep* v. *United States,* 327 U. S. 114 (1946).

objectors entitles them to no guarantee that the FBI reports must be produced for their inspection. We think the Department of Justice satisfies its duties under § 6 (j) when it accords a fair opportunity to the registrant to speak his piece before an impartial hearing officer; when it permits him to produce all relevant evidence in his own behalf and at the same time supplies him with a fair résumé of any adverse evidence in the investigator's report.[10]

Respondents urge that this is not enough. The argument rides hard upon the word "hearing" in § 6 (j). It

---

[10] As to what constitutes a "fair résumé" see *Imboden* v. *United States, supra.* Compare *United States* v. *Oller,* 107 F. Supp. 54 (D. Conn. 1952), and *United States* v. *Bouziden,* 108 F. Supp. 395 (W. D. Okla. 1952).

We need not reach that question in these cases because in our view respondents cannot complain of any failure on the part of the Department of Justice to supply them with a summary of the evidence.

Respondent Nugent first indicated to his local board that he would only serve as a noncombatant. Thereafter, when required to submit additional information, he stated that he was opposed to any military service whatsoever. The local board, after a hearing, classified him as 1–A–O which rendered him eligible only for noncombatant military service. He appealed, claiming total exemption. Pursuant to § 6 (j) his case was referred to the Department of Justice.

Instructions mailed to respondent Nugent informed him of his right to "request" the Hearing Officer to "advise" him of the "general nature and character of any evidence" which was "unfavorable" to his claim. Respondent never requested the Hearing Officer for any summary of the FBI investigation. He claims he was misled by the Hearing Officer's secretary who told him that the "files" were "favorable." But respondent made no effort to verify this statement; at no time did he say anything or make any request to the Hearing Officer concerning the FBI report.

Moreover, the Hearing Officer, in his own report on the case, said nothing which would indicate that the secretary's comment was erroneous. He did not purport to base his recommendation on material submitted by the FBI; rather his recommendation seems based upon Nugent's own conduct and testimony at the hearing coupled

is suggested that the "hearing" prescribed by Congress was purposely designed to allow the registrant to refute— item by item, if necessary—the matters discussed in the investigator's report.[11]  In sum, respondents assimilate the "hearing" in § 6 (j) to a trial and insist that it imports a right to confront every informant who may have rendered adverse comment to the FBI.

The statute does entitle the registrant to a "hearing," and of course no sham substitute will meet this requirement; but we do not think that the word "hearing"— when put in the context of the whole scheme for review set forth in § 6 (j)—comprehends the formal and litigious procedures which respondents' interpretation would attribute to it.  Instead, the word takes its meaning in this instance from an analysis of the precise function

---

with the fact that respondent, in his original classification questionnaire, had indicated a willingness to serve as a noncombatant—the classification to which he had been assigned.

An additional statement by a Special Assistant to the Attorney General, forwarding the Hearing Officer's report to the appeal board, also made no mention that there was adverse matter in the FBI report.

No part of the FBI report was transmitted to the appeal board. Thus the record before the appeal board contained no evidence secured by the FBI.  In view of this, and in view of his failure to make any request to the Hearing Officer, we think that Nugent was not denied any right.

Nor was respondent Packer denied his right to be advised of the general nature of any evidence in the FBI report which might defeat his claim.  In response to his question, the Hearing Officer told him that there was nothing unfavorable in it.  The Hearing Officer's report, which was transmitted to the appeal board, corroborates this view.  Nothing in the FBI report was transmitted to the appeal board, and thus it was given no indication that the FBI report was unfavorable.

[11] See *United States* v. *Geyer*, 108 F. Supp. 70 (D. Conn. 1952), an opinion heavily relied upon by the Court of Appeals in its opinion in the *Nugent* case.

which Congress has imposed upon the Department of Justice in § 6 (j).[12]

The duty to classify—to grant or deny exemptions to conscientious objectors—rests upon the draft boards, local and appellate, and not upon the Department of Justice. The registrant must first look to his local board for the relief he claims; he must convince this body—composed of representatives of his own community—of the depth and sincerity of his convictions. He must fill out forms, calculated to put him to the test;[13] he must supply any additional detailed information which may be necessary for a searching investigation of his claim; and, if he or his local board demands it, he may appear in person to explain his position to the persons charged with determining its validity.[14]

If the local board denies the claim, the responsibility for review, if sought, falls upon the appeal board. The Department of Justice takes no action which is decisive. Its duty is to advise, to render an auxiliary service to the appeal board in this difficult class of cases. Congress was under no compulsion to supply this auxiliary service—to provide for a more exhaustive processing of the conscientious objector's appeal. Registrants who claim exemption for some reason other than conscientious objection, and whose claims are denied, are entitled to no "hearing" before the Department. Yet in this special class of cases, involving as it does difficult analyses of facts and individ-

---

[12] *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294 (1933).

[13] The Selective Service System requires conscientious objectors to fill out a special form. This form supplies the registrant with the opportunity to demonstrate—by pointing to past examples, referring to character witnesses and recounting the background of his training and beliefs—the sincerity of his claim.

[14] 32 CFR (1949 ed.) Part 1624.

ualized judgments, Congress directed that the assistance of the Department be made available whenever a registrant insists that his conscientious objection claim has been misjudged by his local board. Observers sympathetic to the problems of the conscientious objector have recognized that this provision in the statute improves the system of review by helping the appeal boards to reach a more informed judgment on the appealing registrant's claims.[15] But it has long been recognized that neither the Department's "appropriate investigation" nor its "hearing" is the determinative investigation and the determinative hearing in each case. It has regularly been assumed that it is not the function of this auxiliary procedure to provide a full-scale trial for each appealing registrant.

Accordingly, the standards of procedure to which the Department must adhere are simply standards which will enable it to discharge its duty to forward sound advice, as expeditiously as possible, to the appeal board. Certainly, this is an important and delicate responsibility, but we do not think the statute requires the Department to entertain an all-out collateral attack at the hearing on the testimony obtained in its prehearing investigation.

Respondents urge that they have a right to such a procedure under the Fifth Amendment. We cannot agree.

The Selective Service Act is a comprehensive statute designed to provide an orderly, efficient and fair procedure to marshal the available manpower of the country, to impose a common obligation of military service on all physically fit young men. It is a valid exercise of the war power. It is calculated to function—it functions today—in times of peril. Even so, Congress took care to provide special treatment for those who could not

---

[15] See Sibley and Jacob, Conscription of Conscience (1952), 71–76.

reconcile participation in the defense effort with their religious beliefs—if those beliefs were a matter of sincere conviction. Profiting from the experiences of the First World War, Congress adopted a new and special procedure to secure the rights of conscience, which had been given express statutory recognition.

It is always difficult to devise procedures which will be adequate to do justice in cases where the sincerity of another's religious convictions is the ultimate factual issue. It is especially difficult when these procedures must be geared to meet the imperative needs of mobilization and national vigilance—when there is no time for "litigious interruption." *Falbo* v. *United States,* 320 U. S. 549, 554 (1944). Under the circumstances presented, we cannot hold that the statute, as we construe it, violates the Constitution.[16]

The judgments are

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

That so strong a court and one so strong in literary endowment—Swan, C. J., Learned Hand and Frank, JJ.— should rely, as did the Court of Appeals in this case, 200 F. 2d 46, 49–50, on the opinion of a District Judge, impressively attests the persuasiveness of that opinion. Chief Judge Hincks has stated also for me the compelling reasons why the refusal to make available the FBI report on a registrant claiming exemption as a conscientious

---

[16] Cf. *Norwegian Nitrogen Products Co.* v. *United States, supra; Williams* v. *New York,* 337 U. S. 241 (1949).

objector invalidates, on any fair construction of the requirements of the Selective Service Act, his classification as 1–A.

"It is true that on the precise point of law involved the [Selective Service] Act is not explicit: when it directs the board to refer the registrant's claim of conscientious objection 'for inquiry and hearing' by the Department [of Justice], it does not specify that the product both of the inquiry and of the hearing shall be made available to the board. But neither does the Act suggest any reason why the product of the hearing should go forward to the board, as it did here as a matter of course, and the product of the inquiry should be withheld.

"There are, however, other provisions in the Act from which I think one must imply a Congressional intent that the board should have access to the investigative report. The same section of the Act proceeds to provide that after inquiry a hearing shall be had of which the registrant shall be notified. The natural import of this provision is, I think, that the investigative report resulting from the inquiry shall be made a part of the record for consideration by all directly concerned with the classification. Under the contemplated procedure the registrant has already had an opportunity before the draft board to put everything desired into the record. That being so there would be no point to notify him to appear in the departmental hearing just to put in more evidence. Thus, by elimination, the only useful purpose of notice at that stage was to give the registrant opportunity to meet the contents of the report. . . .

.        .        .        .        .

"Congress was not using empty words when in Sec. 451 of the Act it solemnly declared 'that in a

free society the obligations and privileges of serving in the armed forces and the reserve components thereof should be shared generally, in accordance with a system of selection which is fair and just, and which is consistent with the maintenance of an effective national economy.' A system in which selections might be made in uninformed reliance upon the recommendation of an executive officer bottomed perhaps on secret police reports, would indeed make a mockery of that high declaration of policy. Only if the Act be construed to require that the investigative reports shall become a part of the record open to the appeal board and all concerned is the 'system of selection . . . fair and just' within our Anglo-Saxon concepts of justice and due process." *United States* v. *Geyer,* 108 F. Supp. 70, 71–72.

There is a note of uneasiness in the Court's recognition of the difficulty of "devising" procedures "adequate to do justice in cases where the sincerity of another's religious convictions" is in issue. Courts are, no doubt, closely circumscribed in "devising" such procedures where Congress has, with sufficient clarity, bound the allowable judicial discretion in applying legislation. And, of course, only within narrow limits may courts reject a procedure, devised by Congress, on constitutional grounds. The Due Process Clause cannot be bent to what a judge may privately think is wisdom in respecting dissident views. But here the Court ought not to feel an impotent uneasiness. It is not called upon to devise a just procedure; merely to apply one. Considering the traditionally high respect that dissent, and particularly religious dissent, has enjoyed in our view of a free society, this Court ought not to reject a construction of congressional language which assures justice in cases where the sincerity of another's religious conviction is at stake and where prison

may be the alternative to an abandonment of conscience. The enemy is not yet so near the gate that we should allow respect for traditions of fairness, which has heretofore prevailed in this country, to be overborne by military exigencies.

The suggestion that the registrants in these cases have waived their rights by not asking for "a fair résumé" of any adverse evidence in the investigator's report seems to me an instance of keeping the word of promise to the ear and breaking it to the hope. The very purpose of a hearing is to give registrants an opportunity to meet adverse evidence. It makes a mockery of that purpose to suggest that such adverse evidence can be effectively met if its provenance is unknown. Nor is it possible to be confident that a "résumé is fair" when one cannot know what it is a résumé of. This does not suggest purposeful unfairness, still less, want of zeal. Language is treacherous and the meaning of what is written to no small degree derives from him who reads it. In a country with our moral and material strength the maintenance of fair procedures cannot handicap our security. Every adherence to our moral professions reinforces our strength and therefore our security.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I concur in MR. JUSTICE FRANKFURTER's opinion and only add a word. The use of statements by informers who need not confront the person under investigation or accusation has such an infamous history that it should be rooted out from our procedure. A hearing at which these faceless people are allowed to present their whispered rumors and yet escape the test and torture of cross-examination is not a hearing in the Anglo-American sense. We should be done with the practice—whether

14

the life of a man is at stake, or his reputation, or any matter touching upon his status or his rights. If FBI reports are disclosed in administrative or judicial proceedings, it may be that valuable underground sources will dry up. But that is not the choice. If the aim is to protect the underground of informers, the FBI report need not be used. If it is used, then fairness requires that the names of the accusers be disclosed. Without the identity of the informer the person investigated or accused stands helpless. The prejudices, the credibility, the passions, the perjury of the informer are never known. If they were exposed, the whole charge might wither under the cross-examination.