**Clair Laverne WHITE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 13893.**

United States Court of Appeals
Ninth Circuit.

Sept. 14, 1954.

---

Harold Shire, Beverly Hills, Cal., Hayden C. Covington, Brooklyn, N. Y., for appellant.

Laughlin E. Waters, U. S. Atty., Manuel Real, Hiram W. Kwan, Manley J. Bowler, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellant was charged with refusal to be inducted into the armed forces of the United States in violation of the Universal Military Training and Service Act, 50 U.S.C.A.Appendix, § 462. Appellant had registered with a local draft board in Los Angeles July 14, 1949, the day following his 18th birthday. In addition to his classification questionnaire he filed with the Board an executed "Special Form for Conscientious Objector", in which he asserted that by reason of religious training and belief he was conscientiously opposed to participation in war in any form and to participation in noncombatant training or service in the armed forces.

On January 15, 1951, he was classified in Class I-A-O, "conscientious objector available for noncombatant military service only." [1]   He was notified of this ac-

---

1. Regulations, Selective Service System, Title 32, Sec. 1622.6(a), 1949 Ed., provided: (p. 812) "In Class I–A–O shall be placed every registrant who would have been classified in Class I–A but for the fact that he has been found, by reason of religious training and belief. to be conscientiously opposed to combatant training and service in the armed forces." The same provision is Sec. 1622.11(a) of

tion and thereupon requested and was granted a personal appearance and hearing before the local board. After the hearing the board continued him in Class I-A-O. He appealed to the appeal board which reviewed his file and "determined that such registrant is not entitled to classification in either a class lower than IV-E or in Class IV-E." The board forwarded the file to the Department of Justice for an advisory recommendation. Appellant personally appeared before a hearing officer on March 6, 1952. An FBI report of an investigation of the registrant had been furnished this hearing officer who recommended that the appellant be retained in Class I-A-O. This recommendation the Attorney General followed and upon his advice registrant was placed in that class by the board of appeals on May 3, 1952. Appellant made a fruitless effort to induce the National Director to appeal his case to the President; he was ordered to report for induction, but he refused to submit thereto.

Upon this appeal but two contentions are made: the first is that there was no basis in fact for the appellant's classification in Class I-A-O, but that he was entitled as a matter of law to I-O, that is to say, as a person conscientiously opposed to both combatant and noncombatant military service. The second contention is that the court below committed reversible error in refusing to receive in evidence the FBI report.

■ Appellant can make a defence under his first point "only if there is *no basis in fact* for the classification which [the board] gave the registrant." (Emphasis added.) Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 427, 90 L.Ed. 567. The appellant says: "There is no basis in fact for classification in this case because there are no facts which contradict the documentary proof submitted by the appellant." The argument appears to add up to the proposition that since the appellant stated in his questionnaire and in letters addressed to the boards that he was conscientiously opposed not only to combatant service but to noncombatant service as well, and since these statements were supported by letters from his mother and his minister, the selective service boards were obliged to make findings in accordance with his claims, in the absence of other affirmative evidence which contradicted his representations. This argument relies upon Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, and appellant's position is that the rule of that case must be applied here.

We think that the facts of this case do not call for any such conclusion. The question before the local board had to do not with what religious organization or sect the appellant adhered to, nor what the teachings of that sect or organization was, but what was the sincere belief of this particular registrant and what was the extent of his conscientious opposition to military service.[2] In other words, the local board initially, and the appeal board subsequently, were called upon to evaluate a mental attitude and

the 1951 Edition. Sec. 1622.20 of the 1949 Regulations provided for a Class IV-E "Conscientious Objector opposed to both combatant and noncombatant training and service." In the 1951 Edition that class is described in Section 1622.14 as Class I-O.

2. It is noted that the exemption authorized by *section 6(j) of the Act, 50 U.S.C.A. Appendix, § 456(j)*, is based upon the religious belief of the particular individual, not upon the religious tenets of an organization of which he is a member. The reference is to "an individual's belief". See Gonzales v. United States, 6 Cir., 212 F.2d 71, 72: " * * * mem-bers of the sect are not necessarily, by virtue of their membership, conscientious objectors, but each determines, according to his own conscience and according to his personal interpretation of the Bible, whether he may conscientiously engage in military service." In United States v. Simmons, 7 Cir., 213 F.2d 901, 904, it is said: "Affiliation with a particular religious sect does not per se entitle a registrant to conscientious objector status. The duty imposed on the boards is to determine subjectively and objectively the sincerity of the individual's belief, not the nature of the teachings of any religious faith." Cf. Linan v. United States, 9 Cir., 202 F.2d 693.

a belief. It is plain that when such matters are to be determined and passed upon, the attitude and demeanor of the person in question is likely to give the best clue as to the degree of conscientiousness and sincerity of the registrant, and as to the extent and quality of his beliefs. The local board, before whom the registrant appeared, had an opportunity surpassing that available to us or to the appeal board itself to determine and judge as to these matters.

Whether conscientious objectors shall be granted by law an exemption from military service is simply a matter of grace. Local Draft Board No. 1 of Silver Bow County, Mont. v. Connors, 9 Cir., 124 F.2d 388, 390. We deal here with a scheme provided by the legislation and the regulations whereby the question of an individual's right to exemption on account of conscientious objection may be determined in an orderly manner. Thus provision is made for local draft boards, made up of persons acquainted with the local community, and for the personal appearance by the registrant before that board. It would be absurd to think Congress contemplated that it would ever be possible for such a board to provide affirmative evidence as to the mental state of such a registrant. Yet it was obviously not contemplated that all who asserted or swore that they were conscientious objectors should be so classified.

Both boards here were confronted with an attitude which did not precisely fit into the Act's definitions of this claimed exemption. The language of the Act refers to a person "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." There was evidence that White did not precisely fall into this category. For his conscientious objection was a much broader one,—it was an objection to any *governmental* service whatever. As he put it in a letter to the local board: "I cannot and will not serve or swear allegiance to anybody or anything but Jehovah God". He quoted James 1:27 as telling "us to keep ourselves unspotted from this world. We cannot serve two masters". After his appeal had been denied he wrote to the local board: "Now if I go ahead and put my efforts toward doing governmental work, I will not be able to carry out my covenant obligations to God * * * I hope you can realize why I want to be exempted from being forced to do governmental work or being drafted into the armed forces." He spoke of his belief that he "should have no part in the doings of this old world even though [he] may be prosecuted for it." He spoke of his conscientious opposition "to doing or aiding in the wars or affairs of this world." In his conscientious objector form he stated: "We obey the laws of the land only as long as they do not conflict with God's laws." Thus these boards might with reason conclude that they dealt with a registrant whose primary conscientious objection is to *governmental* activity.

Furthermore, the board was cognizant of the fact, disclosed in the questionnaire, and in the registrant's personal appearance before it, that registrant was engaged as an employee of a concern making parts for Douglas Aircraft. The report of the hearing officer shows that these were war contracts on which he was thus employed from 1949 to 1951. The Board's minutes of what transpired at the time of his personal appearance did not purport to be a verbatim account of all that was then said or done. It is obvious, however, that the board was given to understand from the information then furnished it that the registrant was engaged in the manufacture of military equipment.[3]

---

3. The minutes relating to his personal appearance on January 29, 1951, read as follows: "Selective Service System. January 29, 1951. Clair Laverne White, 4 82 31 272, appeared before the Local Board for a personal appearance. Folks went into Jehovahs Witness religion around 1930. Registrant was baptised into religion 1941. Employer is North Hollywood Tool and Die Manufacturing Co. Make parts for Douglas Air Craft, also North American. Steel Priority No.

■ In view of his experiencing no difficulty working upon the manufacture of munitions for war, the board was not without justification in concluding that White had no conscientious objection to participation in war through the manufacture of arms and munitions, just so long as he did so for a private company and not for the government. It was therefore but natural for the boards to believe that if the registrant's conscience was not bothered while working on war contracts he could not justly claim he was conscientiously opposed to noncombatant participation in war activities and that his mere objection to wearing a uniform because it marked him as one working for the government was not the kind of objection contemplated by the statute. Objection to serving a country, even on religious grounds, is not the standard under the statute. The registrant's facility in forwarding the cause of war, force and killing through activity in a war plant, may well demonstrate his failure to establish his status as a person conscientiously opposed to noncombatant duty.

We think that it cannot be adjudged that the local board with its opportunity to size up the registrant upon his personal appearance, which could evaluate his sincerity as it observed his manner and demeanor, and which moreover was confronted by a young man whose obvious objection was not so much to making instruments of death as to doing *anything* for or on behalf of the government, can be said to have acted without basis in fact when it concluded the appellant's conscientious objection did not extend to noncombatant service.

Whether the board was right in that conclusion is not a matter relevant here. "The courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous." Estep v. United States, supra, 327 U.S. at page 122, 66 S.Ct. at page 427, 90 L.Ed. 567.

We therefore conclude that the situation present here is very different than that present in the Dickinson case. In United States v. Simmons, supra, note 2, the court said: "[A] distinction must be drawn, we believe, between a claim of ministerial status and a claim of conscientious objection status as to susceptibility of proof. Whether a registrant is a minister in the statutory sense, having as his principal vocation the leadership of and ministering to the followers of his creed, is a factual question susceptible of exact proof by evidence as to his status within the sect and his daily activities. No search of his conscience is required. Even though the only tenet of his cult be a belief in war and bloodshed, he still would be exempt from military service if he were, in fact, a minister of religion. Is he affiliated with a religious sect? Does he, as his vocation, represent that sect as a leader ministering to its followers? These questions are determinative and subject to exact proof or disproof.

"The conscientious objector claim admits of no such exact proof. Probing a man's conscience is, at best, a speculative venture. No one, not even his closest friends and associates, can testify to a certainty as to what he believes and feels. These, at most, can only express their opinions as to his sincerity. *The best evidence on this question may well be, not the man's statements or those of other witnesses, but his credibility and demeanor in a personal appearance before the fact-finding agency.* We cannot presume that a particular classification is based on the board's disbelief of the registrant, but, just as surely, the statutory scheme will not permit us to burden the board with the impossible task of rebutting a presumption of the validi-

1. Board feels employment status such as to indicate remaining in I–Ao classification, after careful review of file. L.P.F."

This was during military activity in Korea.

ty of every claim based ofttimes on little more than the registrant's statement that he is conscientiously opposed to participation in war." (Emphasis added.) [4]

The action of the appeal board in confirming the classification cannot be said to be without basis in fact in view of the appeal board's knowledge that the local board's determination had been arrived at after its opportunity to observe the registrant's demeanor during his personal appearance.[5] The appeal board likewise had before it, as did the local board, the fact that this registrant's apparent conscientious objection was to any participation in any kind of governmental activity. The situation thus presented to the appeal board was not substantially different from that presented in United States v. Sicurella, 7 Cir., 213 F.2d 911, 913, decided on the same day that court decided the Simmons case. There it was said: "Statements made by appellant in his SSS Form 150 express an objection to any and all obedience to secular authority. Thus he stated that he is 'no part of this world which is governed by political systems,' that he conscientiously objects 'to serving in any military establishment or any civilian arrangement that substitutes for military service' and that he 'cannot desert the forces of Jehovah to assume the obligations of a soldier of this world without being guilty of desertion.'

"Two things are apparent on the face of these statements, i. e., that appellant sets himself separate and apart from all other persons as immune from the constitutional dictates of the national government and that he is asserting a claim of exemption extending to both military and civilian service under the Act, a claim which goes beyond the statutory exemption. 50 U.S.C.A.Appendix, § 456 (j). These claims are consistent only with objections to any command of governmental authority, but do not *per se* establish that deep seated conscientious belief which would entitle appellant to the claimed exemption. On this basis the board could conclude that appellant had not proved himself within the terms of the statutory privilege. Only the boards, local and appellate, are empowered to make that determination. We cannot say that the order here challenged is without a basis in fact."

When White was called before a hearing officer he asked the latter if there was anything unfavorable in the investigative report of the FBI. He was told there was no unfavorable evidence in the report. At the trial below White subpoenaed this report and it was marked for identification. But the trial court excluded it from evidence. This action gives rise to the second point raised by the appellant.

In United States v. Nugent, 346 U.S. 1, 73 S.Ct. 991, 97 L.Ed. 1417 it was settled that the hearing officer's refusal to disclose the entire FBI report does not violate a registrant's rights under the Act or render his classification illegal. The appellant here argues, however, that the Nugent case held that the registrant must be given by the hearing officer a fair résumé of any adverse evidence in the investigative report. Proceeding from this premise, he argues that upon his trial he was entitled to examine and introduce in evidence the FBI report for

4. There is language in Schuman v. United States, 9 Cir., 208 F.2d 801, 804, which, detached from the text in which it is used, is apparently at variance with what is here said. But in that case it was held that the registrant was entitled to a ministerial classification, and hence determination of his status as a conscientious objector was unnecessary to the decision and what was said on that matter was obiter. The question we here considered was not presented in that case.

5. In this respect its action was just the opposite of that taken by the National Appeal Board in United States v. Hagaman, 3 Cir., 213 F.2d 86, and there disapproved. In that case the appeal board, acting on the recommendation of the hearing officer and of the Department, classified the registrant as I-O. But the National board, "on the paper record alone", disapproved and placed him in I-A.

the purpose of laying a foundation for an argument that the hearing officer did not in fact give him a fair résumé or truly state that there was no adverse evidence in the report. Here appellant relies upon the decision and the reasoning in United States v. Evans, D.C., 115 F. Supp. 340.[6]

We think that this position of the appellant cannot be maintained. In the first place, we agree with what is said in United States v. Simmons, supra, to the effect that the question of whether a fair summary of the FBI report must be given by the hearing officer to the registrant was not in issue in the Nugent case. Nugent had not requested such a summary. Packer had been informed there was nothing in the report adverse to him. There was therefore no occasion for the court to prescribe a résumé as a part of the minimum procedural rules.[7]

When the Court spoke of a "fair résumé of any adverse evidence", it was referring to what it had called "the procedure, established by regulation and practice" which the Department of Justice had been following. As pointed out by the Court, 346 U.S. at page 4, 73 S. Ct. at page 994, the registrant was allowed to appear in person and "upon request, he is entitled to be instructed 'as to the general nature and character' of any 'unfavorable' evidence developed by the Department's investigation." In other words, that is the way the Department did it. We find nothing in the opinion to indicate that the Supreme Court considered that the summary thus referred to was required by statute or the demands of due process.

We think that those cases which follow United States v. Evans, supra, have misunderstood the true holding of United States v. Nugent. In that case, speaking of the requirements of Sec. 6(j) in respect to a hearing before the hearing officer, the court said 346 U.S. at page 6, 73 S.Ct. at page 995: "The argument rides hard upon the word 'hearing' in § 6 (j). It is suggested that the 'hearing' prescribed by Congress was purposely designed to allow the registrant to refute—item by item, if necessary—the matters discussed in the investigator's report. In sum, respondents assimilate

---

6. 115 F.Supp. at page 343: "It is my opinion that I cannot conscientiously determine that the résumé was fair without an opportunity to inspect the investigative report of which it is claimed to be a résumé. I think the Act should not be interpreted to mean that any communication by the hearing officer to the registrant with reference to the investigative report is conclusively presumed to be a fair résumé. Even if the résumé given be deemed presumptively fair, on trial the registrant must be allowed to combat the presumption by the only means possible,—comparison with the investigative report itself." This rule has been followed in a number of cases which are collected in United States v. Simmons, supra.

7. In United States v. Simmons, supra, [7 Cir., 213 F.2d 908] it was said: "The government insists, correctly we think, that the only issue before the court, which is pertinent to the question before us, was as to the right to inspect the F.B.I. file and that the last quoted language is obiter occurring in approving the procedure followed by the hearing officer in Nugent's hearing.

"The government's contention is persuasive when the above quotations are considered together. Had the court intended to prescribe the minimum procedural rules for such hearings, it is not unreasonable to assume that it would have done so expressly in its discussion on the issue of constitutionality. There the court said that the hearing must be more than 'sham' but need not be a 'litigious controversy.' Thus we are told that somewhere between these two extremes lies the line between due process and arbitrary action. We are told further that the procedure employed by the hearing officer in Nugent's case falls within the realm of due process. It does not follow from this that the Nugent procedure presents the minimum safeguards which will afford the registrant due process. Furthermore, the court indicated that Nugent and Packer had waived their right to object to any failure on the part of the hearing officer to give them a full summary of the evidence because they had failed to request such a summary. 346 U.S. at page 6, note 10, 73 S.Ct. 991. Thus the issue now facing us was not before the court in Nugent."

the 'hearing' in Sec. 6(j) to a trial and insist that it imports a right to confront every informant who may have rendered adverse comment to the FBI.

"The statute does entitle the registrant to a 'hearing,' and of course no sham substitute will meet this requirement; but we do not think that the word 'hearing'—when put in the context of the whole scheme for review set forth in § 6(j)—comprehends the formal and litigious procedures which respondents' interpretation would attribute to it. Instead, the word takes its meaning in this instance from an analysis of the precise function which Congress has imposed upon the Department of Justice in § 6(j)."

After thus referring to the function which the section imposes upon the Department of Justice, the court significantly cited Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796. At the conclusion of the opinion the court said:

"Under the circumstances presented, we cannot hold that the statute, as we construe it, violates the Constitution." Here, again significantly, the court cited the Norwegian Nitrogen Products Co. case and also Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337.

We think that these two cases give the clue to what the court had in mind in the Nugent case as to the type of hearing which was provided by Sec. 6(j).[8]

Each case furnishes an illustration of a type of investigation and report in respect to which no opportunity is granted the parties affected to pry into the sources of the information or to cross-examine the informers. We think that the reference to these two cases discloses that the Supreme Court had in mind the fact that the hearing provided for in Section 6(j) is one for the benefit of the registrant and for the purpose of making possible a report favorable to him. The only provision for the making

8. The Norwegian Nitrogen case dealt with that provision of the Tariff Act of 1922, § 315, 42 Stat. 858, 941–943, which authorized the President to increase or decrease tariff rates but provided that before proclamation was made by the President, the Tariff Commission should make an investigation in order to assist the President. The act provided that "The commission shall give reasonable public notice of its hearings and shall give reasonable opportunity to parties interested to be present, to produce evidence, and to be heard." It was held that upon a hearing held pursuant to the statute, domestic producers appearing before the Commission might properly furnish their cost of production subject to a pledge of secrecy, and that their foreign competitors appearing at the hearing were not entitled to require the production of this information or to examine or cross-examine concerning it. The court held that the hearing was not one that might be demanded as of right, that it was not intended to be similar to a trial as conducted in a court, but rather a hearing which partook of the nature of the congressional hearings which sometimes precede legislation. In other words, the mere statutory provision for a hearing did not convert an essentially legislative proceeding into an adversary one as in an ordinary law suit.

In Williams v. People of State of New York, the court upheld as against the charge that it was wanting in due process, the practice of New York trial judges when pronouncing sentence in state criminal cases to make use of information contained in reports of probation officers notwithstanding these reports were based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal. Pointing out that information of the kind commonly relied upon by judges in attempting to make intelligent imposition of sentences would be unavailable if that information were restricted to that given by witnesses in open court subject to cross-examination, the court said, 337 U.S. at page 249, 69 S.Ct. at page 1084, 93 L.Ed. 1337: "Under the practice of individualizing punishments, investigational techniques have been given an important role. Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders. There reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information."

of a recommendation by the Department of Justice is: "The Department of Justice shall, after such hearing, *if the objections are found to be sustained,* recommend to the appeal board that * * * he shall be assigned to noncombatant service as defined by the President, or * * * be ordered by his local board * * * to perform * * * such civilian work * * *.", etc. (Emphasis added.) The fact that the Act itself makes no express provision for anything except a favorable report, cannot be without significance. See Elder v. United States, 9 Cir., 202 F.2d 465, 468.[9]

This is clearly the theory upon which the regulations have been framed. Thus Section 1626.25 of Regulations, Title 32, in dealing with the procedure where the registrant claims to be a conscientious objector, provides for the transmission of the file to the Department of Justice only in case the appeal board first determines that the registrant is not entitled to be placed in Class I-A-O or in Class I-O. Subdivisions 2, 3, 4. Subdivision (b) then provides: "No registrant's file shall be forwarded to the United States Attorney by any appeal board and any file so forwarded shall be returned, unless in the 'Minutes of Actions by Local Board and Appeal Board' on the Classification Questionnaire (SSS Form No. 100) the record shows and the letter of transmittal states that the appeal board reviewed the file and determined that the registrant should *not* be classified in either Class I-A-O or Class IV-E under the circumstances set forth in paragraph (a)

(2) or (4) of this section." (Emphasis added.)

Congress might well have provided that after the appeal board had made its decision upon the conscientious objector claim, the Selective Service proceedings were at an end.[10] Under the Regulations the appeal board must first pass judgment upon whether the registrant is entitled to the exemption claimed. If it decides in his favor that is an end of the matter and no Department of Justice hearing is required. It is only when the appeal board denies the claim that the hearing is provided for. We think this discloses that the Regulations contemplate that the hearing is designed to ascertain whether new *support* for the registrant's claim is obtainable.[11]

We see nothing in the requirements of the statute or in the demands of due process or in what was decided in the Nugent case which would require that any portion of an FBI investigation undertaken for these purposes should be made available to the registrant either before the hearing officer or at the time of his prosecution for failure to submit to induction. All of the practical considerations relating to a probation report which were alluded to in Elder v. United States, footnote 11, supra, and in Williams v. People of State of New York, supra, apply here as reasons for denying similar access to the FBI report.

Finally, as we view it, the decision in the Evans case, supra, seems to assume that the Supreme Court failed to see the whole picture when it decided the Nugent case. But we think the court must

9. It is here that we find one distinction between this case and United States v. Gray, 9 Cir., 207 F.2d 237. The FBI report and the other documents there considered related to a security check in connection with screening of seamen under the Magnuson Act, 50 U.S.C.A. §§ 191, 192. That material was collected in an effort to ascertain matters adverse to the seaman.

10. As stated in the Nugent case, 346 U.S. at page 8, 73 S.Ct. at page 996, 97 L. Ed. 1417, "Congress was under no compulsion to supply this auxiliary service".

11. It is a matter of common knowledge that if the FBI is to obtain from neighbors or acquaintances of the registrant a report on which it can rely, it is essential "that frankness on the part of persons interviewed be encouraged by assurance that their identity will not be divulged", Elder v. United States, supra, 202 F.2d at page 469. A favorable report by a neighbor who expects to have his identity disclosed to the registrant would not be worth much.

have had in mind all the considerations which we have just mentioned. It knew that Packer, like Evans, had been told by the hearing officer that there was nothing unfavorable in the FBI report. It is true that it was not considering assignments by Nugent and Packer that their offers of proof of the FBI reports were rejected in the trial court. But surely the Supreme Court knew perfectly well that if there were anything to appellants' present contention such would normally be Nugent and Packer's next step, once they were put on trial. We refuse to believe that the Court labored and brought forth a mouse of a decision that the hearing officer need not show the FBI report when the situation was such that the trial court must necessarily admit it.

We find no error in the record and the judgment is affirmed.