**UNITED STATES v. GRAY.**

**UNITED STATES v. ROGERS.**

**UNITED STATES v. WICKLIFFE.**
Nos. 13499–13501.

United States Court of Appeals,
Ninth Circuit.

Sept. 22, 1953.

Warren Olney, III, Asst. Atty. Gen., Washington, D. C., J. Charles Dennis, U. S. Atty., John E. Belcher, Asst. U. S. Atty., Seattle, Wash., Geoffrey J. Lanning, Asst. Chief Counsel, U. S. Coast Guard, Robert S. Erdahl, Beatrice Rosenberg, Attys., Department of Justice, Washington, D. C., for appellant.

John F. Walthew and Melville Oseran, Seattle, Wash., for appellees.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

This is an appeal by the United States from judgments of dismissal entered upon motions to dismiss indictments which had been separately returned against the three defendants, Gray, Rogers, and Wickliffe. The cases were consolidated for purposes of the appeal.

The indictments, laid under the Magnuson Act, 50 U.S.C.A. §§ 191, 192, allege that appellees had unlawfully entered upon and accepted employment on merchant vessels of the United States without first obtaining specially validated Merchant Marine documents as required by Executive Order 10173, as amended, Nos. 10277, 10352, U.S.Code Cong. and Adm.Service 1950, p. 1661; 1951, p. 1073; 1952, p. 1056, and the rules and regulations promulgated in furtherance thereof. These violations are alleged to have occurred during October or November of 1951. The motions to dismiss were grounded on the claim that the Act is unconstitutional and the regulations thereunder invalid. As we construe its ruling the trial court went no further than to hold that the regulations, as here administered, violated the due process clause in that the defendants were not adequately informed of the charges upon which they were denied clearance or accorded a fair hearing thereon.

The Magnuson Act, approved August 9, 1950, shortly after the commencement of the military conflict in Korea, is an amendment of Title II of the Act of June 15, 1917. Briefly summarized, and insofar as needful to be stated here, it authorizes the President, whenever he finds that the security of the United States is endangered by reason of actual or threatened war, to institute measures and issue rules and regulations, and to employ such agencies or instrumentalities of the United States as he may deem necessary to safeguard vessels, harbors, and waterfront facilities of the United States against destruction, loss or injury from sabotage, or other subversive acts or causes of a similar nature. The executive orders and regulations set up pursuant to the Act provide for the screening or exclusion from all significant American shipping of those individuals who do not satisfy the Commandant of the Coast Guard that their presence aboard a merchant vessel of the United States would not be inimical to the security of the United States. To render himself eligible for employment on American merchant ships a seaman must have possession of documents indicating security clearance.[1]

Apparently the normal procedure for the seaman is to make application at a local Coast Guard office for his security credentials. The application is then forwarded to Coast Guard headquarters at Washington, D. C., where the seaman's name is checked against information contained in the Coast Guard's files. The information considered by the Coast Guard is based primarily on reports received from the various intelligence agencies of the United States government, including the Federal Bureau of Investigation. Executive Order 10173, as amended, provides that the Commandant shall not issue validated documents "unless he is satisfied that the character and habits of life of the applicant therefor are such as to authorize the belief that the presence of such individual on board a vessel, or within a waterfront facility would not be inimical to the security of the United States." Regulations issued by the Commandant [33 CFR 121.13(d)] have spelled out the basis for rejection in detail. Paragraph numbered (5) of this regulation appears to be the one of relevance in the cases before us, and is shown on the margin.[2]

A seaman denied clearance by the Commandant has a right of appeal to a local board which is theoretically composed of one Coast Guard member, one member from management, and one from labor. The management and labor representatives are nominated by the Secretary of Labor, and it is required that the board "shall insure the appellant all fairness consistent with the safeguard of the national security." 33 CFR 6.10–9. On such an appeal the seaman is

---

1. An exhaustive discussion of the nature and development of the screening program is contained in the opinion of Judge Murphy in Parker v. Lester, D.C., 112 F.Supp. 433. There the Presidential orders and the rules and regulations of the Commandant are set out, and the growth and variation of the administrative practices are described. The availability to the general reader of this exceptionally full and capable exposition of the subject greatly shortens our own labors.

2. "(5) Is or recently has been a member of, or affiliated, or sympathetically associated with, any foreign or domestic organization, association, movement, group, or combination of persons (i) which is, or which has been designated by the Attorney General as being totalitarian, fascist, communist, or subversive, (ii) which has adopted, or which has been designated by the Attorney General as having adopted, a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or (iii) which seeks, or which has been designated by the Attorney General as seeking, to alter the form of the Government of the United States by unconstitutional means: Provided, That access may be granted, notwithstanding such membership, affiliation, or association, if it is demonstrated, by more than a mere denial, that the security interests of the United States will not thereby be jeopardized."

given the first opportunity for a hearing which the regulations afford him. In the instant cases the local board to which the three excluded seamen took their appeals consisted of a single member— a Coast Guard official—representatives of management and labor not yet having been appointed.[3] At the hearing the seaman is entitled to appear personally and to be represented by counsel, and he may introduce evidence and witnesses in his own behalf. The local appeal board sends its recommendation, whether favorable or unfavorable, directly to the Commandant at Washington, the latter being in all instances the final authority in the granting or denial of security clearance. If the decision is adverse to the seaman, he is notified by the Commandant that he has a right of further appeal to a national appeal board at Washington. The procedure of the latter is essentially the same as that of the local boards.[4]

In ruling on the motions to dismiss in the present cases the trial court had

before it as exhibits a transcript of the hearing before the interim appeal board at Seattle in the case of appellee Wickliffe, plus the letter from the Coast Guard to appellee Rogers rejecting his application for a validated Merchant Mariner's document. It was agreed by the parties that the first of these exhibits is typical of the hearings given all three appellees and the second typical of the notices sent them. The second exhibit—the letter from the Commandant—is set out in full on the margin, and it will be left to speak for itself.[5] We turn briefly to the hearing.

At the opening of the proceeding on the appeal of Wickliffe the latter was advised by the board member that the reason for his screen-off was "that you have been or are considered to be sympathetic to the policies or principles of the Communist Party, or affiliated with the Communist Party, or otherwise associated with it in such a manner to indicate that you are considered to be a poor security risk. That is all I can tell

3. In Parker v. Lester, supra note 1, it was observed that in the earlier stages of the program the single member boards were the only ones established, but later on tripartite boards were set up. The court saw a "pronounced difference" between the practice of the interim and that of the tripartite boards, the seamen appearing before the latter being informed and questioned concretely concerning specific instances of alleged misconduct of which the board had information.

4. Manifestly the right of appeal to the national board is in most instances of no practical value to an unemployed seaman on the Pacific Coast, due to factors of distance and expense. Thus unless the seaman is given a fair opportunity before the local board of refuting the charges against him little could be expected in consequence of the additional appeal.

5. "United States Coast Guard
   "Seattle, Wash., June 5, 1951
"George Banious Rogers,
1452 21st Avenue, Seattle,
  Washington.
Sir:
"Under the provisions of the President's Executive Order No. 10173, you are hereby advised that your applica-

tion for documents as a merchant seaman has been rejected.

"The reason for this action is the finding by the Commandant of the Coast Guard that your presence on board merchant vessels of the United States would be inimical to the security of the United States. This finding is based on the belief that you are affiliated with, or sympathetic to an organization, association, group or combination of persons subversive or disloyal to the Government of the United States.

"In the event that you hold a license or seaman's documents issued to you previously, you are advised that you are ineligible for employment on any merchant vessel of the United States within the following categories:"

[Here follows description of the type of merchant vessels covered by the screening program.]

"Pending the setting up of appeal boards prescribed in Executive Order No. 10173 you may appeal this action by communicating with the nearest Coast Guard Officer in Charge, Marine Inspection, who will refer you to the Coast Guard official who has been designated to act as the local appeal board.

"By direction of the Commandant.
  "/s/ Earl N. Story,
    "Lieutenant Commander U.S.C.G."

you." Wickliffe was then asked whether he had ever belonged to the Communist Party under any name, or to any branch of it; whether he had ever attended any meetings of the Communist Party or its affiliates; whether he had ever donated any money to the Communist Party, and other questions of like general nature. To all these questions he gave negative answers. Except in one particular to be adverted to in a moment, the interrogation of Wickliffe by the board member was lacking in specificity as regards particular events or the elements time, place, and persons present. A Mr. Nichols, a member of Wickliffe's union, who was present at the hearing in an advisory capacity, at one stage of the proceeding pointedly called the board's attention to the necessity of particularizing if Wickliffe were to be given any opportunity to present a defense. He inquired of the board member why Wickliffe was not informed of the specific Communist meetings he was supposed to have attended, where and when the meetings were held and who was present at them, "because," said Nichols, "I am quite sure we can prove from [the Union's] records at 110 Cherry and furnish some of discharges whereby we can prove that he [Wickliffe] was at sea." The board member replied that he was in a position to say only that Wickliffe was reported to have been a member of the Water Front Region of the Communist Party as late as July 1950.

The excepted particular referred to above was in relation to Wickliff's activities as a member of the Progressive Party in 1948. He was quizzed on this subject in considerable detail and with respect to specific events. He admitted membership in that party and his support of Mr. Wallace, whom, he said, he regarded as a friend of the colored people.[6] He admitted busying himself in connection with a certain Progressive Party meeting called to his attention, by

arranging seats, helping build platforms, etc. Near the conclusion of the inquiry the board member said that he desired to make it clear that the basis of Wickliffe's being screened-off was not the fact that he was a member of or active in the Progressive Party. Questions were asked as regards that matter, said the board member, merely to make sure of Wickliffe's identity. It would appear that the board member was able to become specific only as regards incidents unrelated to the charge against the seaman.

There seems no reason to doubt that the screening operation initiated by the Magnuson Act is a legitimate war measure. The Executive Order and the regulations of the Commandant issued in implementation of this security legislation do not appear to us on their face to infringe the due process clause of the Fifth Amendment. Depending on the manner in which they are administered, they would appear to afford a fair means of reconciling the problems of security with those of individual freedom.[7] We are in general agreement with what Judge Murphy had to say on the subject in his opinion in Parker v. Lester, supra. More particularly are we in accord with his conclusion that due process in the context of the screening program is properly definable in terms of the maximum procedural safeguards which can be afforded the individual without jeopardizing the national security.[8]

Permitting access to the material in the dossier of the Commandant concerning the individual denied clearance, or revelation of the names of the informants, would very likely tend to dry up the sources of information. Cf. Elder v. United States, 9 Cir., 202 F.2d 465, 468; United States v. Nugent, 346 U.S. 1, 73 S.Ct. 991; Parker v. Lester, supra, 112 F.Supp. at page 443 et seq. Never-

---

6. Wickliffe is a Negro.

7. See Mr. Justice Douglas' remarks, concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, at page 174, 71 S.Ct. 624, 95 L.Ed. 817.

8. Parker v. Lester, D.C., 112 F.Supp. 433, at page 443.

theless, as pointed out in the last cited authority, 112 F.Supp. at page 444, no good reason appears why the Commandant can not apprize the seaman of the basis for the initial determination with such specificity as to afford him notice and an opportunity *to marshal evidence in his behalf*; and the same is true of the conduct of the examination before the appeal board. It is not impracticable, and we are unable to believe that it would be hurtful to the security program, to inform the seamen of the *contents* of the showing against him. True, the doing of that is time-consuming and requires effort and the taking of pains. The regulations, however, provide that "every effort [be] made to protect the interests of the United States and of the appellant." In the cases before us the letter of the Commandant was totally devoid of helpful information, and the information imparted by the hearing officer was so general in character as to afford virtually no opportunity of refutation beyond a mere denial of the charges.

For the reasons given we think the judgments of dismissal were proper, and they are affirmed.