227 F.2d 708
 Lawrence E. PARKER, Peter Mendelsohn, Fred H. Kulper, Claude
Payney, Theodore W. Rolfs and Harold Fontaine, Appellants,
v.
J. A. LESTER, Jack Eaton, John Rylander, Joseph E. Stika, J.
E. Hannewyk and L. E. Carlson, Appellees.
 No. 14081.
 United States Court of Appeals Ninth Circuit.
 Oct. 26, 1955.
 
 Gladstein, Anderson, Leonard & Sibbett, Richard Gladstein, Norman Leonard, San Francisco, Cal., for appellants.
 Warren E. Burger, Asst. Atty. Gen., Donald B. MacGuineas, Paul A. Sweeney, Attys., Dept. of Justice, Washington, D.C., Lloyd H. Burke, U.S. Atty., San Francisco, Cal., for appellees.
 Before HEALY, McALLISTER and POPE, Circuit Judges.
 POPE, Circuit Judge.
 
 
 1
 The appellants as plaintiffs below brought an action against the officers of the United States Coast Guard stationed in the San Francisco area who are charged with the administration and enforcement of certain executive orders and regulations issued and adopted for the purpose of excluding from employment upon merchant vessels persons not found to be 'safe and suitable' for such employment. The action sought to enjoin the enforcement of the regulations and also asked for declaratory relief. It was alleged that the regulations were not authorized by statute; that they provided for procedures prohibited by the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., and that the regulations, both as promulgated and as administered, have operated to deprive the plaintiffs of their liberty and property rights without due process of law, and that the regulations and the screening program established thereby are void and unconstitutional.
 
 
 2
 The district court granted the plaintiffs a measure of relief in that it entered a decree enjoining the defendant Coast Guard officials from giving any effect to a denial of security clearance and from preventing a seaman from being employed on merchant vessels, unless the seamen were furnished certain information and bills of particulars. Deeming the reach of the decree inadequate and asserting that the court erred in qualifying its injunction and in not enjoining any further operation of the screening program under the regulations, the plaintiffs have brought this appeal.
 
 
 3
 The facts in the case and the provisions of the applicable executive order and Coast Guard regulations are set forth at great length and in complete detail in the opinion of the district court, Parker v. Lester, 112 F.Supp. 433.[1] For that reason nothing more needs to be done here than to summarize the facts which gave rise to the action.
 
 
 4
 In 1950, during the Korean crisis, Congress enacted the so-called Magnuson Act, 64 Stat. 427, 1038, Title 50 U.S.C.A. §§ 191, 192, 194. This Act provided that 'Whenever the President finds that the security of the United States is endangered by reason of actual or threatened war, or invasion, or insurrection, or subversive activity, or of disturbances or threatened disturbances of the international relations of the United States, the President is authorized to institute such measures and issue such rules and regulations * * * to safeguard against destruction, loss, or injury from sabotage or other subversive acts, accidents, or other causes of similar nature, vessels, harbors, ports, and waterfront facilities in the United States, the Canal Zone, and all territory and water, continental or insular, subject to the jurisdiction of the United States.' Thereafter the President issued executive order 10173.[2] This order, as amended, found that the security of the United States was endangered by subversive activity and prescribed certain regulations relating to the safeguarding of vessels, harbors, ports and waterfront facilities in the United States. The order vested enforcement of the Act in the Coast Guard and provided that seamen should not be employed on American merchant vessels unless they held validated documents which the Commandant of the Coast Guard was not to issue 'unless the Commandant is satisfied that the character and habits of life of such person are such as to authorize the belief that the presence of the individual on board would not be inimical to the security of the United States * * *.'[3]
 
 
 5
 The regulations adopted by the Commandant of the Coast Guard pursuant to the executive order mentioned, recited that in determining whether security clearance would be denied, 'the Commandant may consider whether on all the evidence and information available reasonable grounds existed for the belief' that the seaman (1) has committed acts of treason, espionage or sabotage; (2) is under the influence of a foreign government; (3) has advocated the overthrow of the Government by force or violence; (4) has intentionally disclosed classified information to unauthorized persons; or (5) is or recently has been a member of or affiliated with an organization designated by the Attorney General as totalitarian, fascist, communist, or subversive.[4]
 
 
 6
 Under the practice provided by these regulations when a seaman applies for clearance to accept employment, his application is checked by the Coast Guard, and if this is initially denied, he is so notified in writing. As noted by the trial court's opinion, at the time the case was tried these regulations merely directed that the person so denied clearance should be informed of the 'general basis' of such denial accomplished by a form letter containing the general language quoted, 112 F.Supp. at page 439 of that opinion.
 
 
 7
 The decree below enjoined further administration of the security program unless a more specific statement of the basis for the initial determination be furnished the seaman 'to be worded with such specificity as to afford the seaman reasonable notice of the said basis and an opportunity to marshal evidence in refutation thereof.'[5]
 
 
 8
 It is to be noted that the first information which a seaman has is the notification that he may not further seek or continue employment upon any merchant vessel. He is given no opportunity to participate in the process of examining the facts which may have a bearing upon this initial determination. Although the decree below requires some measure of specificity in the notice of the initial determination of the Commandant, and although it permits the seaman to demand a bill of particulars, yet it specifies 'that such bill of particulars need not set forth the source of such data, nor disclose the data with such specificity that the identity of any informers who have supplied such allegations or data will necessarily be disclosed to the said seaman or to other persons.'
 
 
 9
 Following such an initial security denial, the seaman is permitted by the regulations of the Coast Guard to apply first to a local and then to a national appeal board, each composed of one Coast Guard, one management, and one labor member. The appeal board has before it the complete record on which the Commandant's initial determination to deny clearance was made; but none of this is disclosed to the seaman although he may appear in person and by counsel and may submit testimonial and documentary evidence.[6]
 
 
 10
 As the trial court pointed out, the record shows that when these seamen appeared before the appeal boards, some of them were questioned by the examiners for the board and some were not, but in general the board took literally the language of the executive order to the effect that 'no person shall be issued a document required for employment * * * unless the Commandant is satisfied', etc. In short, the burden was placed upon the seaman, notwithstanding the knew neither the names nor identity of his accusers nor anything else about them.
 
 
 11
 It is to be noted also that upon the so-called appeals provided for by the regulations, the appeal boards are without power to do anything other than make a recommendation to the Commandant who 'may either approve or reject the recommendation of the board, or remand the case for further proceedings'. 'The Commandant is the final authority to grant or deny security clearance'. After he has considered recommendations of the board, he makes the final decision.
 
 
 12
 At the threshold of the argument in this court, the appellees asserted that the appellants have no standing to prosecute this action for the reason that they have failed to exhaust their administrative remedies. The same contention was made in the court below and the circumstances giving rise to the argument and the contention of the appellees are set forth in the opinion of the trial court. 112 F.Supp. at pages 440-441. The trial court upheld the right to maintain the action and rejected appellees' argument that failure to exhaust an administrative remedy made the action premature or required the court to deny relief. We agree with the district court's disposition of that contention.
 
 
 13
 At the time the trial court's decision was rendered, plaintiff Rolfs had been finally refused clearance by the Coast Guard Commandant although the court found that he had been invited to appear again before a local appeal board for a reexamination of the issues. We have noted that the Coast Guard has amended its regulations subsequent to the decree in an effort to conform to the holdings of the district court. The appellants have been given an opportunity to prosecute appeals under those revised regulations, and some of them have such appeals now in process, either before the local board or before the national appeal board. One appellant has failed to take an available appeal to the national board from an adverse decision of the local board. Hence, say appellees, the objection as to failure to exhaust administrative remedies still applies and those who have received clearance have no standing to sue. The district court held this suit properly brought as a class action under Rule 23(a)(3), Fed.Rules Civ.Proc. 28 U.S.C.A. This holding is not challenged by appellees. Some of the appellants have not been cleared for employment, and hence they have standing here.[7]
 
 
 14
 When the nature of plaintiffs' action is considered, it is apparent that no rule relating to prior exhaustion of administrative remedies can deprive the court of authority to pass upon the issues here present. The doctrine of exhaustion of administrative remedies has application in certain types of cases, all of which are substantially different than that presented here. Where an action is brought to obtain a review by the court of an administrative order, as for instance, the judicial review authorized by the Administrative Procedure Act, Sec. 1009, Title 5 U.S.C.A., of 'final agency action', and the remedy before the agency has not been concluded, of course the right to review has not arisen. The case is not 'ripe for review'. Cf. Federal Power Comm'n v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408. And where in connection with such an administrative proceeding Congress has provided that the remedy before the administrative body is exclusive and has created means for review or enforcement of the board's order in a court, the inference is unavoidable that the statutory procedure is exclusive and that trial of issues in the authorized manner cannot be short-circuited through an independent action for injunction in the district court. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638.
 
 
 15
 Manifestly this is not such a case. The proceeding in the lower court was in no sense a proceeding designed to review administrative action. It cannot be, for the Magnuson Act, the executive order and the regulations contemplate no such review. Indeed, it is the position of the defendants, with which the trial court agreed, that the provisions of the Administrative Procedure Act, including its provisions for judicial review, have no application here.
 
 
 16
 There are cases in which for special reasons the courts have held that an application for relief to an administrative agency is a condition precedent to the maintenance of a court action. Some of these are listed in the district court's opinion. Illustrative of such is Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553.[8] The rationale supporting such cases is clearly set forth in Great Northern Ry. Co. v. Merchants Elev. Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.[9]
 
 
 17
 But the case before us is of a character which traditionally is for consideration and determination in a court of equity. It is within the original jurisdiction of the district court because the matter in controversy 'arises under the Constitution * * * of the United States.' Title 28 U.S.C.A. § 1331. It seeks the traditional injunctive relief. Plaintiffs were able to show and did show that the defendants through the application of the alleged void and unconstitutional regulations had deprived them of employment and were threatening further to deprive them of future work as merchant seamen.
 
 
 18
 The rights which plaintiffs seeks to enforce and preserve are similar to those recognized and enforced in Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131. Although the employment of which plaintiffs were deprived was prospective only, yet their right to earn a livelihood, like that in Truax, was one entitled to protection at the hands of a court of equity. As stated in that case, 239 U.S. at page 38 (36 S.Ct. at page 9) 'The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will.' The right of action here would appear to be founded upon the same equitable principles declared in the Truax case.[10]
 
 
 19
 We perceive no reason why the court below must stay its hand until the plaintiffs have completed the so-called appeals authorized by the regulations. Here the constitutional validity of those regulations is under direct attack. Here, as in Great Northern Ry. Co. v. Merchants Elev. Co., supra, no fact, evidential or ultimate, is in controversy. The controversies here 'involve only questions of law'.
 
 
 20
 Appellees rely upon Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796, in support of their contention that the mere fact that the action raises a constitutional question which arises upon an application for equitable relief does not avoid the necessity of the petitioners first exhausting their appeal procedures under the regulations. That case is readily distinguishable from the present one and inferentially supports the view which is here expressed.
 
 
 21
 In the Aircraft case, the Renegotiation Act, 50 U.S.C.A.Appendix, § 1191, there under consideration authorized any contractor or subcontractor aggrieved by order of the board to file a petition for redetermination with the Tax Court. The section provided "Upon such filing such court shall have exclusive jurisdiction, by order, to finally determine the amount, if any, of such excessive profits received or accrued by the contractor or subcontractor, and such determination shall not be reviewed or redetermined by any court or agency." 331 U.S. at page 765, 67 S.Ct. at page 1499. The Court held that the language of the Act was such that Congress had clearly commanded that the administrative remedy be sought initially or exclusively, and that this was done to procure uniformity of administrative policy and disposition and expertness of judgment. This was based upon the Tax Court's expertness in fiscal matters. The Court alluded to the congressional purpose of avoiding litigation in the ordinary sense.
 
 
 22
 Here, of course, we have no provisions, whether in the Act, the executive order or the regulations, which are comparable to those which the Court found determinative in the Aircraft case. There, after arriving at the indicated conclusions as to the meaning of the Renegotiation Act and its provisions that the remedy in the Tax Court should be exclusive, the Court undertook, 331 U.S. at page 774 (67 S.Ct. 1493) to consider separately the showing made in support of equitable intervention by way of injunction. The fact that the Court treated the considerations relating to equitable relief separately, suggests inferentially that had the suit been recognized as one normally within the jurisdiction of a court of equity, it might have arrived at a different conclusion. The Court found, however, that there was no basis for equitable relief for in that case the petitioner who sought to maintain his action in equity was a subcontractor and held that he had an adequate remedy by action at law against the contractor who in substance was a stakeholder between the petitioner and the Government. 331 U.S. at page 776 (67 S.Ct. 1493).
 
 
 23
 Here, plainly, these plaintiffs have no adequate or any remedy at law. The damages of which they complain are irreparable. They have lost their opportunities for employment, some of them for months, and some for years,[11] and will continue to suffer such loss in the future if the defendants be not enjoined from the enforcement of the regulations complained of.
 
 
 24
 It is apparent that the so-called appeal before the appeal boards is no remedy in fact or in law. The question of lack of due process of law in the procedures called for by the regulations in question is not only beyond the competence or power of the boards or of the Commandant to try and determine, but one which in the nature of the case, those officers would not undertake to consider.
 
 
 25
 In Aircraft & Diesel, supra, the Court recognized that where the administrative remedy provided by statute was demonstrably "incapable of affording due process", this fact alone might excuse prior resort to those remedies. Speaking of war emergency legislation the Court said, 331 U.S. at page 774 (67 S.Ct. at page 1504): 'In such cases, 'only if we could say in advance of resort to the statutory procedure that it is incapable of affording due process to petitioners could we conclude that they have shown any legal excuse for their failure to resort to it or that their constitutional rights have been or will be infringed,' Yakus v. United States, 321 U.S. 414, 435, 64 S.Ct. 660, 672, 88 L.Ed. 834, a statement implicitly requiring exhaustion, not merely initiation, of the statutory procedure.' In the Yakus case the petitioner not only had an opportunity for hearing before the Administrator (which hearing the Court said was capable of affording due process, 321 U.S. at page 434 (64 S.Ct. 660)) but the Emergency Court had full power to review all questions of law. Here, on the contrary, we can say in advance just what process, due or otherwise, these regulations entail,11A and there is no provision for any review of the Coast Guard determination.
 
 
 26
 This brings us to the merits of the case and to a determination of whether the plaintiffs have demonstrated that the regulations, or the administration thereof, through which they have been deprived of their opportunities to pursue their chosen occupations, are void and illegal because they are being deprived of their liberty to pursue those occupations without due process of law.
 
 
 27
 We reach this constitutional question here because we are in agreement with the determination of the district court that the Magnuson Act authorized the screening of seamen and the promulgation of regulations to accomplish that end. The district court correctly rejected the argument that the Act did not authorize a screening program. We also agree that the Administrative Procedure Act and its requirements for notice, hearing and judicial review, are not applicable in this case.[12]
 
 
 28
 Under this screening system there is no provision whatever for notice and an opportunity to be heard as generally understood to be required by the provisions of the Fifth Amendment relating to due process. When it is proposed to take from a citizen through administrative proceedings some right which he otherwise would have, it has always been held that the constitutional requirement is that he shall be afforded notice and an opportunity to be heard. The demands of due process do not require a hearing at the initial stage or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective. Opp Cotton Mills v. Administrator, 312 U.S. 126, 152, 61 S.Ct. 524, 85 L.Ed. 624. But the constitutional right to a hearing has always been understood to include at some stage of the proceeding at least that which was defined in Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 999, 82 L.Ed. 1129, as follows: 'The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasijudicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.'[13]
 
 
 29
 None of the plaintiffs here had any notice prior to the initial determination by the Commandant that they could no longer be employed on board ships. The regulations provided for so-called appeals before a local and a national board at which, under the provisions of the trial court's decree, they are to be furnished the following information only: '(1) A statement of the basis for the initial determination that said seaman is a poor security risk or is not entitled to security clearance, the said statement to be worded with such specificity as to afford the seaman reasonable notice of the said basis and an opportunity to marshal evidence in refutation thereof, and otherwise in his behalf and, (2) Upon demand a statement of particulars setting forth the alleged acts, associations or beliefs or other data which formed the basis for the determination that such seaman is a poor security risk or is not entitled to security clearance, provided however that such bill of particulars need not set forth the source of such data, nor disclose the data with such specificity that the identity of any informers who have supplied such allegations or data will necessarily be disclosed to the said seaman or to other persons.'[14] Thus if the Commandant's information is that at a certain time and place the accused seaman in a conversation with an acquaintance spoke disparagingly of the American flag, the seaman will have no information that this incident is being considered, for to mention the charge would be to disclose the informer. Of course, if the seaman knew the latter's identity he might discover that the informant was a person who had been a bitter rival for some union position or a person possessed of motives likely to induce complete fabrication of the report. Indeed, it is not apparent that the members of the board before whom the seamen are permitted to appear would be in a position to furnish such data or its source or the identity of the informers had they chosen to do so for it does not appear that they themselves had it. The practice was to obtain reports from the FBI, or some other governmental investigative agency, which procured statements in some undisclosed form from confidential sources. As the chairman of the appeal board in the San Francisco area testified, he did not know the names of the persons who gave the reports to the information gathering agency. Although that agency indicated upon its report how it evaluated the information received by it, the chairman did not know who those persons were who evaluated the testimony nor the means which they adopted in rating it. He had no information as to whether the informant was telling the agent what he knew of his own knowledge, or whether he was relating what he had been told by someone else, or whether the information given was first, second, third or fourth hand by the time it reached the agent. Under the decree that system is permitted to continue in the future as it has in the past.
 
 
 30
 What happens to a seaman in the position of one of these plaintiffs is substantially the same thing that happens to an attorney who suddenly finds himself disbarred without prior notice or an opportunity to be heard. Recently this court had occasion to hold that such a disbarment was a violation of the Fifth Amendment. In re Los Angeles County Pioneer Society, 9 Cir., 217 F.2d 190. Quoting from an earlier decision this court there said: "In the two cases cited, supra, upon which the District Attorney relies, it is clearly recognized as indispensable that the subject of such a proceeding be advised of the proposed action and of the basis therefor, and that he have his 'day in court.' In other words, he must in advance be informed of the purpose of the proceeding and of the grounds therefor, and be afforded a fair opportunity to interrogate the witnesses testifying against him and to produce evidence in refutation or rebuttal." 217 F.2d at page 193.
 
 
 31
 Those who sue here are in the position of persons who under ordinary conditions would be entitled to claim the benefits of the due process clause. The liberty to follow their chosen employment is no doubt a right more clearly entitled to constitutional protection than the right of a government employee to obtain or retain his job. It has been suggested that the latter is not entitled to protection of the due process clause. Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, 57.[15] Even the alien lawfully residing in the United States is entitled to this protection. See Kwong Hai Chew v. Colding, 344 U.S. 590 (73 S.Ct. 472) and cases (73 S.Ct. 477, 478) cited in footnotes at pages 596-598. The plaintiffs here are citizens of the United States and the rights and liberties which they assert relate not to any public employment present or prospective, but to their right to pursue their chosen vocations as merchant seamen.
 
 
 32
 The whole question here is whether the danger or possible danger to national security is of such character and magnitude that the ancient and generally accepted rights of notice and hearing envisioned by the Fifth Amendment may be denied to these seamen citizens. In dealing with this problem, the trial court said in its opinion, supra, 112 F.Supp. at page 443: 'Where national security is involved, the courts have gone far in permitting limitation of the usual procedural protections. * * * I define due process in terms of the maximum procedural safeguards which can be afforded petitioners without jeopardizing the security program.' The court concluded that in this instance 'considerations in favor of protecting the investigatory tasks of governmental agencies outweigh the disadvantages flowing to the individual petitioners.'
 
 
 33
 In embarking upon a similar undertaking to balance the public's interest in security and the Government's right to assure it, on the one hand, as against the liberties of the individual, on the other, it is important to bear in mind just what it is that we now weigh in the balance. It may be taken for granted that in view of the emergencies referred to in the Act and in the executive order it was altogether appropriate to establish a system whereby persons who are security risks may be denied employment upon merchant ships. The existence of the emergency, the seriousness of the danger legislated against, and the necessity for such legislation are for determination by other departments of the Government, not by us. We think it clear that the screening of persons who are security risks is permissible as a matter of substantive due process.[16]
 
 
 34
 What we must balance in the scales here does not involve a choice between any security screening program and the protection of individual seamen. Rather we must weigh against the rights of the individual to the traditional opportunity for notice and hearing, the public need for a screening system which denies such right to notice and hearing. Granted that the Government may adopt appropriate means for excluding security risks from employment on merchant vessels, what is the factor of public interest and necessity which requires that it be done in the manner here adopted? We think that the trial court's opinion failed to note how narrow this question is. The court said: 'At the outset, it must be remarked that opportunity for confrontation and cross-examination of adverse witnesses cannot be afforded a petitioner in these situations without destroying the security program.' That statement is too strong. Obviously it would be a simple matter to set up regulations which protect the individual affected in respect to notice and an opportunity to be heard. Such a system might make more work for the investigating officers, and pose more difficulties. But security screening would not be destroyed.
 
 
 35
 The trial court said: 'The Federal Bureau of Investigation has uniformly insisted that practically none of the evidential sources available will continue to be available to it if proper secrecy and confidence cannot at all times be maintained with respect to the original source of information.'[17] This prospective drying up of sources of information appears to have tipped the scales in the trial court's judgment against the plaintiffs. That is evident in the provision in the decree that the bill of particulars 'need not set forth the source of such data, nor disclose the data with such specificity that the identity of any informers who have supplied such allegations or data will necessarily be disclosed to the said seaman or to other persons.' The question is: Is this system of secret informers, whisperers and talebearers of such vital importance to the public welfare that it must be preserved at the cost of denying to the citizen even a modicum of the protection traditionally associated with due process?
 
 
 36
 The answer is to be found in the language used by Mr. Justice Jackson in his opinion in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 224-227, 73 S.Ct. 625, 97 L.Ed. 956. That was a dissenting opinion because the majority of the Court considered that the individual there involved was merely an alien seeking entrance and hence not entitled to claim protection of the due process clause. But if we remember that here we deal with citizens who seek, as did the plaintiffs in Truax v. Raich, supra, to vindicate their means of earning a livelihood in one of the common occupations which the Court there said (239 U.S. 33, 36 S.Ct. 10) was 'of the very essence of the personal freedom and opportunity that it was the purpose of the (Fourteenth) Amendment to secure',[18] it will be apparent that the language of Mr. Justice Jackson has special significance here. It must be noted that while he there spoke of detention of an alien what he said about procedural due process is precisely applicable to the exclusion of a citizen from his employment. Because the fundamental law there set forth has seldom if ever been better expressed, it is appropriate to quote at length, 345 U.S. at pages 225-227, 73 S.Ct. at page 636:
 
 
 37
 'The most scrupulous observance of due process, including the right to know a charge, to be confronted with the accuser, to cross-examine informers and to produce evidence in one's behalf, is especially necessary where the occasion of detention is fear of future misconduct, rather than crimes committed. Both the old proceeding by which one may be bound to keep the peace and the newer British 'preventive detention' are safeguarded with full rights to judicial hearings for the accused. On the contrary, the Nazi regime in Germany installed a system of 'protective custody' by which the arrested could claim no judicial or other hearing process, and as a result the concentration camps were populated with victims of summary executive detention for secret reasons. That is what renders Communist justice such a travesty. There are other differences, to be sure, between authoritarian procedure and common law, but differences in the process of administration make all the difference between a reign of terror and one of law. Quite unconsciously, I am sure, the Government's theory of custody for 'safekeeping' without disclosure to the victim of charges, evidence, informers or reasons, even in an administrative proceeding, has unmistakable overtones of the 'protective custody' of the Nazis more than of any detaining procedure known to the common law. Such a practice, once established with the best of intentions, will drift into oppression of the disadvantaged in this country as surely as it has elsewhere. That these apprehensive surmises are not 'such stuff as dreams are made of' appears from testimony of a top immigration official concerning an applicant that 'He has no rights.'
 
 
 38
 'Because the respondent has no right of entry, does it follow that he has no rights at all? Does the power to exclude mean that exclusion may be continued or effectuated by any means which happen to seem appropriate to the authorities? It would effectuate his exclusion to eject him bodily into the sea or to set him adrift in a rowboat. Would not such measures be condemned judicially as a deprivation of life without due process of law? Suppose the authorities decide to disable an alien from entry by confiscating his valuables and money. Would we not hold this a taking of property without due process of law? Here we have a case that lies between the taking of life and the taking of property; it is the taking of liberty. It seems to me that this, occurring within the United States or its territorial waters, may be done only by proceedings which meet the test of due process of law.
 
 
 39
 '* * * But when indefinite confinement becomes the means of enforcing exclusion, it seems to me that due process requires that the alien be informed of its grounds and have a fair chance to overcome them. * * *
 
 
 40
 'The Communist conspiratorial technique of infiltration poses a problem which sorely tempts the Government to resort to confinement of suspects on secret information secretly judged. I have not been one to discount the Communist evil. But my apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else.'
 
 
 41
 The principles there expressed require a determination that the regulations and the system of screening here under attack constitute a violation of due process and that the plaintiffs were entitled to an injunction and a declaration of rights accordingly. It may be assumed that this determination will remove from the investigative agencies, to some degree, a certain kind of information and that, in the future, some persons will be deterred from carrying some of these tales to the investigating authorities. It is unbelievable that the result will prevent able officials from procuring proof any more than those officials are now helpless to procure proof for criminal prosecutions. But surely it is better that these agencies suffer some handicap than that the citizens of a freedom loving country shall be denied that which has always been considered their birthright. Indeed, it may well be that in the long run nothing but beneficial results will come from a lessening of such talebearing. It is a matter of public record that the somewhat comparable security risk program directed at Government employees has been used to victimize perfectly innocent men.[19] The objective of perpetuating a doubtful system of secret informers likely to bear upon the innocent as well as upon the guilty and carrying so high a degree of unfairness to the merchant seaman involved cannot justify an abandonment here of the ancient standards of due process.
 
 
 42
 It should be noted that the rights of the individual here considered are also fundamental in the sense that if they are limited, qualified or non-existent in the case of merchant seamen, they can be modified or limited or held non-existent as applied to all other persons. It cannot be said that in view of the large problem of protecting the national security against sabotage and other acts of subversion we can sacrifice and disregard the individual interest of these merchant seamen because they are comparatively few in number. It is not a simple case of sacrificing the interests of a few to the welfare of the many. In weighing the considerations of which we are mindful here, we must recognize that if these regulations may be sustained, similar regulations may be made effective in respect to other groups as to whom Congress may next choose to express its legislative fears. No doubt merchant seamen are in a sensitive position in that the opportunities for serious sabotage are numerous. If it can be said that a merchant seaman notwithstanding his being on board might sink the ship loaded with munitions for Korea, it is plain that many persons other than seamen would be just as susceptible to security doubts. The enginemen and trainmen hauling the cargo to the docks, railroad track and bridge inspectors, switchmen and dispatchers, have a multitude of opportunities for destruction. Dangerous persons might infiltrate the shipping rooms of factories where the munitions are being packed for shipment to Korea with opportunities for inserting bombs appropriately timed for explosion on board ship. All persons who are in factories making munitions and material for the armed forces have opportunities for sabotage, and the same may be said of all operators of transportation facilities, not to mention workers upon the docks.
 
 
 43
 Of course it is competent for Congress to choose for itself the places where emergency precaution shall be applied and our judgment must be limited to the legislation as enacted. What we are saying here is that the right of the citizen to insist upon the ancient safeguards of notice and hearing notwithstanding national emergency of the kind here assumed to exist, is something that must be judged not on the assumption that the few may be sacrificed for the many but upon the assumption that if these men, engaged in ordinary tasks of earning a livelihood, may be denied the usual measure of due process, then multitudes of others may be dealt with in like manner.
 
 
 44
 Furthermore, in considering the public interest in the preservation of a system under which unidentified informers are encouraged to make unchallengeable statements about their neighbors, it is not amiss to bear in mind whether or not we must look forward to a day when substantially every one will have to contemplate the possibility that his neighbors are being encouraged to make reports to the FBI about what he says, what he reads and what meetings he attends. It may be possible that we have reached an age when our system of constitutional freedom and individual rights cannot hold its own against those who, under totalitarian discipline are prepared to infiltrate not only our public services, but our civilian employments as well. In the event of war we may have to anticipate Black Tom explosions on every waterfront, poison in our water systems, and sand in all important industrial machines. But the time has not come when we have to abandon a system of liberty for one modeled on that of the Communists. Such a system was not that ordained by the framers of our Constitution. It is the latter we are sworn to uphold.
 
 
 45
 In United States v. Gray, 9 Cir., 207 F.2d 237, 241, this court affirmed the judgment of the District Court for the Western District of Washington dismissing the Government's prosecution against certain seamen charged with having unlawfully entered upon and accepted employment on merchant vessels without first complying with the regulations here involved. The dismissal which we there approved was upon the ground that in those particular cases the seamen had been given no information with respect to charges against them adequate or sufficient to permit them to marshal evidence on their own behalf or an opportunity to refute the charges. In the course of our opinion we expressed 'general agreement' with what Judge Murphy had to say in his opinion in Parker v. Lester, supra, with respect to the regulations of the Commandant infringing the due process clause of the Fifth Amendment and stated that the regulations 'do not appear to us on their face' thus to infringe.
 
 
 46
 The present record was not before us when that opinion was written, and it is to be noted that the district court's opinion previously cited makes no reference to certain of the qualifications which the decree now before us attaches to the injunction issued. With respect to that matter, the district court's opinion reads as follows: 'While it may not be feasible to reveal to petitioners the source of the evidence against them, no reason appears in common sense or respondents' argument why petitioners should not be informed of the contents of the testimony. Thus a bill of particulars should be furnished upon demand and petitioners should be given an opportunity to rebut specific allegations of misconduct or other acts and associations which the board considers probative.' 112 F.Supp. at page 444.
 
 
 47
 The decree now before us fails to command, without qualification, that plaintiffs should 'be informed of the contents of the testimony' and that they 'should be given an opportunity to rebut specific allegations of misconduct or acts and associations which the board considers probative'. The qualification which the district court attached was that such bill of particulars need not set forth the source of such data, nor disclose the data with such specificity that the identity of any informers that supplied such data will be disclosed to the said seaman or other persons. We have previously noted an example of a case in which, pursuant to the decree, all reference to the charge could be withheld from the accused seaman on the ground that to mention the charge would disclose the informant. That this qualification as a practical matter gives the Coast Guard carte blanche to withhold substantially any information the officials may choose to keep from the seamen, will readily be apparent when it is noted that there is no practical means by which the Coast Guard's selection of this material can be changed or corrected. If it charged that the seaman once attended a meeting alleged to have been a Communist meeting, the Coast Guard official might withhold all reference to this lest a reference to the meeting might suggest the identity of those who attended and who might have become informers. His action in so doing would not be reviewable or controllable. No one but he would know he had done it. If it be charged that the seaman solicited another to join the Communist party, that charge would have to be deleted from the information lest it identify the person solicited as a possible informer. Because there is no possible way in which the seaman may be protected against an arbitrary or capricious application of this qualification, this paragraph of the decree is without practical significance as a measure of control over the information to be disclosed. None of this was apparent to us when our opinion in the Gray case was written. Furthermore, our decision there was in favor of the seamen and the language used with respect to the decision in this case was wholly unnecessary to our decision.
 
 
 48
 It is suggested that the holding in United States v. Nugent, 346 U.S. 1, 73 S.Ct. 991, 97 L.Ed. 1417, that the hearing officer investigating a Selective Service registrant's claim of conscientious objection need not disclose the entire FBI report to such registrant, is a holding which would support a conclusion here that these merchant seamen were not entitled to more information with respect to the charges against them. In White v. United States, 9 Cir., 215 F.2d 782, at pages 788 to 791, certiorari denied 348 U.S. 970, 75 S.Ct. 528, this court had occasion to analyze the holding of United States v. Nugent and to interpret it in the light of the authorities cited by the Supreme Court as the basis for its decision. As we there pointed out, the hearing, prescribed by the Department of Justice for alleged conscientious objectors was only provided after the appeal board had first found against the registrant. The Department investigation therefore was like the post-conviction proceedings in the case of Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337, upon which the decision in Nugent was predicated. As we said in White v. United States, supra, the Selective Service regulations construed in the Nugent case provided for a hearing to ascertain whether new support for the registrant's claim was obtainable. The matters in the hands of the hearing officer there were obtained for those purposes and had no resemblance to the information used in connection with the Coast Guard's screening of merchant seamen where the Coast Guard is attempting to use the material against the seamen.[20]
 
 
 49
 The regulations as enforced and carried out by the Coast Guard operated to deny the plaintiffs due process of law and in consequence they are entitled to an injunction against the further enforcement of those regulations and of any acts on the part of the defendants pursuant thereto which will operate or tend to deprive plaintiffs of their employment as seamen upon merchant vessels. In so deciding we have no occasion to hold whether in subsequent attempts to carry out the objectives of the merchant seamen screening program regulations might be adopted which in some degree qualify the ordinary right to confrontation and cross-examination of informers.[21] It is sufficient to say that as framed and operated these regulations fall short of furnishing the minimum requirements of due process in respect to notice and opportunity to be heard.
 
 
 50
 The judgment is reversed and the cause remanded with directions to enter judgment enjoining and restraining the defendants from enforcing the regulations against the plaintiffs.
 
 
 51
 HEALY, Circuit Judge (dissenting).
 
 
 52
 I would affirm the decision and order below on the grounds and for the reasons stated in the trial court's opinion, D.c., 112 F.Supp. 433. The Supreme Court had opportunity in Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, to determine the constitutional issue which this case presents, but it chose not to do so. Particularly in light of what was said in our opinion in United States v. Gray, 9 Cir., 207 F.2d 237 at page 241, I would not undertake to reverse the present judgment but would leave the issue to the Supreme Court to determine on certiorari.
 
 
 
 [1]
 A further account of the regulations will be found in United States v. Gray, 9 Cir., 207 F.2d 237. See also 'Security Tests for Maritime Workers: Due Process Under The Port Security Program', 62 Yale Law Journal 1163 (July, 1953)
 
 
 [2]
 15 F.R. 7005, U.S.Code Congressional Service, p. 1661. It was amended by executive order 10277 and executive order 10352, 16 F.R. 7537, U.S.Code Congressional and Administrative Service 1951, p. 1073, and 17 F.R. 4607, U.S.Code Congressional and Administrative News 1952, p. 1056
 
 
 [3]
 The executive order also provided: 'Persons who are refused employment or who are refused the issuance of documents or who are required to surrender such documents, under this subpart, shall have the unions which had negotiated contracts and shall appoint Boards for acting on such appeals. Each such Board shall, so far as practicable, be composed of one Coast Guard officer, one member drawn from management, and one member drawn from labor. The members drawn from management and labor shall, upon suitable security clearance, be nominated by the Secretary of Labor. * * * The Board shall consider each appeal brought before it and, in recommending final action to the Commandant, shall insure the appellant all fairness consistent with the safeguarding of the national security.'
 
 
 [4]
 These provisions are given verbatim in the district court's opinion, 112 F.Supp. at pages 437, 438, and in 33 C.F.R. 121.13(d)
 
 
 [5]
 Pursuant to the command of the decree, the Coast Guard has subsequently amended its regulations in this regard and provided as follows: 'The statement of the basis for the action taken under subparagraph (1) or (2) of this paragraph shall be worded with such specificity as to afford such person an opportunity to marshal evidence in refutation thereof, and otherwise in his behalf. This statement shall not be worded with such particularity as to disclose the source of such information or data, nor the identity of any person or persons who may have furnished such information or data, to said person or other persons.'
 
 
 [6]
 Although the regulations provide that the board shall obtain from the Commandant 'the complete record in the case' on which the Commandant has acted in making his initial determination, yet this does not mean that the board members or the Commandant have any personal knowledge of the persons who had furnished the information upon which the initial determination was made. As stated in the trial court's opinion which became its findings: 'The board members, themselves, had no personal knowledge of the reliability and veracity of the informers and had to rely on the degree of creditability which a governmental investigative agency accorded such sources of information.' 122 F.Supp. at page 439
 
 
 [7]
 The appellees have filed in this court an affidavit disclosing that on February 5, 1955, appellant Rolfs filed notice of his intention to appeal to the national board following an adverse determination by the local board; that Fontaine has an appeal before the local board at San Francisco in which he has not yet appeared before the local board and which is still pending; that appellant Mendelsohn was continued as a security risk following a hearing before a local board, and that although notified thereof on September 24, 1954, he has not taken any appeal to the national board. The affidavit further shows that on January 26, 1955, Parker who had been screened off the SS President Cleveland on February 1, 1951, and whose first appeal was rejected May 16, 1951, and who subsequently was given a further hearing before a local appeal board on January 26, 1955, was notified that he had been granted security clearance by letter dated April 7, 1955. Appellants Kulper and Payney have also been notified of their security clearance. See the district court's opinion, 112 F.Supp. at page 439, col. 1
 
 
 [8]
 The action to recover excessive charges imposed by the railroad although maintainable at common law cannot be instituted in the district court in advance of the shippers' seeking primary redress through the Interstate Commerce Commission. Any other conclusion would destroy the uniformity which the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., was supposed to accomplish
 
 
 [9]
 Cases like Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., supra, are contrasted with the cases leading to a different conclusion in the footnote, 259 U.S. on page 295, 42 S.Ct. 477, in that case
 
 
 [10]
 The plaintiffs allege that in losing their opportunity for employment they also lost their opportunities to be members of and have rights in sundry maritime labor unions which had negotiated contracts and procured various employee rights for their members. These are alleged to be 'valuable property rights'. Membership in a union was admitted in the answer. The trial court appears not to have made any finding with respect to these alleged union rights
 
 
 [11]
 Plaintiff Rolfs was 'screened off' on Nov. 27, 1950; Mendelsohn, on Nov. 6, 1950; and Fontaine on Feb. 19, 1951. On April 29, 1955, the date of the affidavit mentioned in footnote 7, supra, they were still denied security clearance
 11A This distinction is pointed up by a comparison of the regulations adopted in conformity with the decree below, and the regulations considered in National Lawyers Guild v. Brownell, D.C.Cir., 225 F.2d 552, 557. In that case the court pointed out that the Attorney General's rules of procedure there considered 'permit a proceeding which would comply in all respects with that (Administrative Procedure) Act. On this point, as on the prior one, it is enough for us to say we cannot now speculate as to the nature of the proceeding which may occur * * *.' Here, on the contrary, the Coast Guard regulations expressly recite (note 5, supra); 'This statement shall not be worded with such particularity as to disclose the sources of such information or data, nor the identity of any person or persons who may have furnished such information or data, to said person or other persons.'
 
 
 [12]
 The District Court held that the exception in that Act, of cases involving 'the conduct of military, naval, or foreign affairs functions. * * *' applied here. Whether or not this exception applies, this is not a 'case of adjudication required by statute to be determined on the record after opportunity for an agency hearing,' within the meaning of Title 5, § 1004
 
 
 [13]
 This has always been taken for granted. Thus Judge Lemmon, when a judge of the district court, said by way of dictum that the suspension without a hearing of a licensed deck officer would 'not measure up to due process.' In re Merchant Mariners Documents issued to Dimitratos, D.C.N.D.Cal., 91 F.Supp. 426, 429. See also Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 300, 57 S.Ct. 724, 728, 81 L.Ed. 1093: 'Upon the strength of these unknown documents refunds have been ordered for sums mounting into millions, the Commission reporting its conclusion, but not the underlying proofs. The putative debtor does not know the proofs today. This is not the fair hearing essential to due process. It is condemnation without trial.'
 
 
 [14]
 In Yarmolinsky, 'Case Studies in Personnel Security', (Aug. 1955), Case 57, p. 301, is a report of the appearance of a seaman before such a board. It is fairly representative of the procedure which was described in the record in this case
 
 
 [15]
 This decision was affirmed by an equally divided court in Bailey v. Richardson, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352. But compare the majority opinion in the Court of Appeals with Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216
 
 
 [16]
 This statement is not without a possible qualification which is not important here. The regulations provide that the Commandant will deny a security clearance if reasonable grounds exist for the belief that the individual: '5. Is or recently has been a member of, or affiliated, or sympathetically associated with, any * * * organization * * * which is, or which has been designated by the Attorney General as being totalitarian, fascist, communist or subversive. * * *' There is nothing in the regulations which requires proof of membership with knowledge of the character of the organization. Under the terms of the regulation the membership may be innocent and the person may have joined unaware of the organization's activities and programs. Wieman v. Updegraff, supra, may therefore suggest that as a matter of substantive due process a merchant seaman cannot be barred from his regular private employment for mere membership in an organization on the Attorney General's list of subversive organizations. For reasons presently appearing we do not reach that question here
 
 
 [17]
 There is some doubt that this statement thus strongly worded can be proven as a matter of fact. On the face of it it is a mere speculation as to the results which would come about from something which as yet has not been tried. In the procuring of evidence for the prosecution of criminal cases, the Federal Bureau of Investigation has shown no signs of collapsing because proof of guilt must be furnished by witnesses who must appear for confrontation and cross-examination. Of course, in weighing the constitutionality of legislation the validity of which is dependent upon the existence of a set of facts, the court will ordinarily take for granted those facts which the legislature assumed to be true in making the enactment. We make a like assumption with respect to the quoted statement concerning the Federal Bureau of Investigation
 
 
 [18]
 'For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.' Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220
 
 
 [19]
 See report by Joseph P. Blank in Look Magazine, Vol. 19, No. 10, May 17, 1955, entitled 'Security Risk' and describing the suspension as a security risk of Abraham Chasanow, a civilian employee of the Navy. The conclusion of that matter is there described as follows: (p. 29)-- '(Navy Assistant Secretary James Smith) told a press conference that Abraham Chasanow had suffered a 'grave injustice.' He emphasized the finding of the second Review Board that 'the pattern of Mr. Chasanow's life portrays an above-average, loyal American citizen.' The informants who had given evidence against Chasanow had been interrogated again, the Secretary said, and 'either failed to corroborate their original testimony or were unable to produce specifics of earlier allegations.' In conclusion, the Secretary charged the informants with a 'disservice' to their country and conceded that the Navy was 'probably a little naive' in not investigating their credibility.'
 
 
 [20]
 It is interesting to note that the decision in the Nugent case was predicated upon the assumption that the hearing officer gave the registrant a fair resume of any adverse information in the investigative report. See also Simmons v. United States, 348 U.S. 397, 75 S.Ct. 397. The decree of the district court, as above noted, calls for something less than a fair resume of any adverse evidence here in that no resume is required if it is likely to disclose the identity of the informer
 
 
 [21]
 Of course it is not the function of this court to draft an acceptable set of regulations for the Coast Guard. It is fully realized that the practical problem of meeting the minimum requirements of due process is a most difficult one. Even if it were assumed that it were sufficient to provide that the seaman must be furnished a fair resume of the charges against him, it is apparent that ordinary standards of fairness would require that he be permitted through his counsel to challenge the resume furnished to him and to require a demonstration that it is indeed a fair one. We do not presently know how that could be done without access at least to the investigative agency's original report
 Judge Hincks dealt with this problem in a case which we declined to follow in White v. United States, supra, for reasons there set forth. See United States v. Evans, D.C., 115 F.Supp. 340, 343. But while for the reasons previously indicated we considered the language of Judge Hincks in the Evans case inapplicable to a Selective Service registrant claiming conscientious objection deferment, it is peculiarly applicable to the hypothetical case of a regulation calling merely for a fair resume to a merchant seaman. What he said was: 'It is my opinion that I cannot conscientiously determine that the resume was fair without an opportunity to inspect the investigative report of which it is claimed to be a resume. I think the Act should not be interpreted to mean that any communication by the hearing officer to the registrant with reference to the investigative report is conclusively presumed to be a fair resume. Even if the resume given be deemed presumptively fair, on trial the registrant must be allowed to combat the presumption by the only means possible,-- comparison with the investigative report itself.'