Joseph Clinton McBRIDE, Plaintiff,

v.

E. J. ROLAND, Commandant, United States Coast Guard, Defendant.

United States District Court
S. D. New York.
Dec. 15, 1965.

Melvin L. Wulf, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, New York City, for defendant; Robert E. Kushner, Asst. U. S. Atty., Benjamin C. Flanagan, Thomas H. Boerschinger, Attys., Dept. of Justice, of counsel.

RYAN, Chief Judge.

Plaintiff moves for summary judgment on the pleadings and the administrative record; defendant concedes that there is no question of fact and in turn seeks summary judgment in its favor (although it has not so moved).

Plaintiff is a merchant seaman who was denied by the Commandant of the Coast Guard special validation endorsement of his Mariner's documents and thus foreclosed from shipping on vessels of 100 gross tons and over.

The action of the Commandant was taken under the Magnuson Act of August 9, 1950, 64 Stat. 427, 50 U.S.C. § 191, Executive Order No. 10173, October 18, 1950 (15 F.R. 7005, 1950 U.S.Code Cong.Service, p. 1661), and the regulations issued by the Coast Guard pursuant thereto (33 C.F.R. Parts 6, 121).

This suit is filed under the first, fifth and sixth Amendments and the Magnuson Act (28 U.S.C.A. §§ 1331, 2201). The complaint is not concise or clear; and is overburdened with lengthy recitals of what appears in the administrative record, disputes the evidence and protests plaintiff's loyalty and patriotism. Getting down to specific allegations, it does allege that the acts of the Commandant of the Coast Guard are illegal, arbitrary and void because (a) the executive orders and regulations on which they are based are unconstitutional, illegal and void in that they deprive plaintiff of liberty and property without due process of law, that they are vague and uncertain, that they punish membership in undefined organizations, and deny plaintiff his rights of freedom of speech, press and assembly, and his right to an impartial hearing, (b) there is no evidence to support the Commandant's conclusion and it therefore arbitrarily punishes plaintiff, and (c) the practice contained in the executive orders and regulations is not authorized by statute. Plaintiff's damages are alleged to be in excess of $50,000., and claimed to be irreparable. The relief sought is a declaration that the defendant's acts are unconstitutional and an injunction against defendant's carrying out his decision and interfering with plaintiff's employment; affirmatively plaintiff asks that the Commandant be directed to approve his application for a validation endorsement.

All the evidence is contained in the administrative record which has been

submitted to the Court. The record discloses the following undisputed facts:

On July 19, 1959 plaintiff seaman applied to the Commandant for validation of his mariner's document. With the application plaintiff returned a printed questionnaire furnished him by the Coast Guard which called for disclosures of past and present membership in several organizations including the Communist Party. The questionnaire as filled in by plaintiff revealed membership in the IWO but not in the Communist Party.

By letter of October 15, 1959 the Commandant informed plaintiff that additional information was required in order to determine his eligibility for a specially validated document, and requested answers to further detailed interrogatories; plaintiff returned the answers on March 30, 1960. At this point plaintiff *admitted membership in the Communist Party from 1938 through 1950*, but *denied membership for other years.* He also admitted employment at Communist Party Headquarters from 1948 to 1959; signing a 1939 Communist Party nominating petition; participation in the 1951 and 1952 May Day Parades in New York City and in the 1942 Communist Party election campaign; registered affiliation with the American Labor Party from 1949 through 1954; signature of a nominating petition for Elizabeth Gurley Flynn in her *1957* campaign for the New York City Council; attendance in *1957* at the New York State Communist Party Convention, the National Communist Party Convention, and other Communist Party Conventions. What plaintiff did not answer (on the ground that he did not remember or did not understand) were questions concerning attendance at a Communist Party School in 1939, employment at the Communist Party Headquarters, open expressions of adherence to or admiration of Communist Party policies, association with or employment by people he believed were Communists, or his presence at the offices of the Daily Worker in 1958.

By letter of November 23, 1960, the Commandant notified plaintiff that he was not satisfied that plaintiff's presence on board vessels of the United States would not be inimical to the security of the United States. The Commandant listed 25 reasons for his conclusion, beginning with plaintiff's membership in the Communist Party up to and including 1959 and ending with his employment at Communist Party Headquarters from about 1944 through 1959 and attendance at the Daily Worker's offices as late as 1958 and including numerous designated activities of plaintiff in behalf of the Communist Party within that time. The Commandant's letter informed plaintiff of his right to file an answer and to request a hearing. Plaintiff filed an answer disputing the accuracy of the statements and conclusions in the Commandant's letter and requested a hearing.

Subsequently, on November 28, 1962 and May 14, 1963, hearings were held. The Hearing Board consisted of a civilian hearing examiner in the employ of the Coast Guard, and a labor representative and a management representative selected from a panel named by the Secretary of Labor. Both plaintiff and the Government presented witnesses and exhibits and had opportunity of cross-examination. The record evidence showed:

Plaintiff was born in Florida on May 31, 1911; during his childhood he had three years formal education at a Bible school; he came to New York in 1932. After he joined the Communist Party in 1936, plaintiff was taught to read and write by a Party member. In the late 1930's, plaintiff attended the Daily Worker School (the "Jefferson School") for four or five weeks. Here, he was taught the theories of Marxism and Leninism, particularly as to "how to bring about a solution to the Negro question"; he attended lectures by lecturers in the Party, and was given Communist publications to study.

From 1948 through August 4, 1960, plaintiff was employed as an elevator operator and night watchman at Communist Party Headquarters, a position which required membership in the Party. Although plaintiff claimed that he had

left the Party in 1957, he explained the fact that the Party continued to employ him beyond 1957 at its Headquarters by stating that only his group branch knew that he had ceased being a Party member.

Although plaintiff testified that he joined the Party and remained in the Party solely because the Communists "were supposed to help the cause of the Negro", the evidence discloses that his activities in behalf of the Party were extensive. He attended Communist Party Club meetings during the late 1940's and early 1950's; sometime subsequent to 1941 he became a member of the Waterfront Section of the Party; he attended Communist Party state and national conventions as late as 1957; he followed the Party line against United States involvement in the Korean war, and was employed by the Party for two months in 1950 in organizing a peace demonstration for May Day 1950, and participated in these demonstrations in 1951 and 1952. In addition, plaintiff signed various nominating petitions for Communist Party members, attended Communist Party camps where lectures were regularly given in Communist doctrine, and did general political work: picketed, passed out leaflets, sold the Daily Worker and worked at rallies.

Plaintiff testified that he left the Communist Party in 1957 because "the Communist Party was not alert and on the ball on the Negro question," in spite of the fact that he testified that he had first become dissatisfied with it for this reason during World War II, and again in 1951. He also testified that when he did leave, he did not change his ideas about the Party, but only left because it was not interested in the "Negro question".

While a Party member, plaintiff learned that the Communist Party advocated the overthrow of the present form of government in this country, and while he was not sure that he would have participated in such a revolution, he testified that if the Communists did start a revolution he would "go on the side of the Americans" and "fight against the Communists."

At the hearing, plaintiff presented two character witnesses. The first, Patricia Mae Buitoni, stated that she knew plaintiff well since 1947; that she attended May Day Parades frequently and had visited Communist Party Headquarters, but denied membership in the Party. The second witness, Ed Woodhead, testified to having first met plaintiff late in 1959 or early 1960 in a neighborhood bar, but his knowledge of plaintiff was apparently confined to conversations with him during occasional meetings at the bar and a few meals at plaintiff's home.

### The Commandant's Decision

The Commandant having "reviewed the record of the hearing and considered the recommendations of the Hearing Board", by decision dated October 14, 1963, denied plaintiff's application for special validation endorsement of his U. S. Merchant Mariner's Document, on the ground that he was not satisfied that plaintiff's "character and habits of life are such as to authorize or warrant the belief that your presence on board a merchant vessel of the United States would not be inimical to the security of the United States." He based this conclusion on a finding that "[f]or more than twenty years, beginning in 1936 when you joined the Communist Party, you were knowingly and sympathetically associated and affiliated with the Communist Party as demonstrated by your active participation in the Communist Party and in Communist Party-inspired organizations and activities." The Commandant found further that plaintiff's conduct indicated that "he was well indoctrinated in and fully realized, accepted, and approved the aims and objectives of the Communist Party, *including the overthrow of the present form of Government in the* United States *by force and violence and Communist domination of the World."*

The Commandant did not credit plaintiff's testimony that he had joined the Communist Party because he thought the Communists would help the cause of

the Negro, nor that he had left the party in 1957. He found that plaintiff's testimony in these respects was negated by his continued association with and participation in the Communist Party and its activities long after his alleged disillusionment with the Party and by plaintiff's employment at Communist Party National, State and County headquarters up to 1960, which employment would not have been available to a non-Party member. Plaintiff's explanation that he kept his job because headquarters did not know that he had left the party was not believed by the Commandant.

The Commandant's decision notified plaintiff that he had the right to appeal his decision within twenty days. Plaintiff did appeal, but waived the right to appear personally or by counsel before the Appeal Board, electing to rely on the record below. The Appeal Board recommended affirmance of the Commandant's decision, and the Commandant, on March 3, 1964, adhered to his decision.

It is upon this record that we proceed.

The Magnuson Act in pertinent part authorizes the President whenever he finds the security of the United States threatened by subversive activity to issue rules and regulations to safeguard its vessels, harbors and waterfront facilities against destruction, sabotage and subversive activities. On October 18, 1950, the President issued Executive Order No. 10173 (15 F.R. 7005) providing that the

> "Commandant may require that all licensed officers and certificated men who are employed on other than the exempted designated categories of merchant vessels of the United States be holders of specially validated documents. The form of such documents, the conditions, and the manner of their issuance shall be as prescribed by the Commandant. The Commandant shall revoke and require the surrender of a specially validated document when he is no longer satisfied that the holder is entitled thereto."

Pursuant to the direction of this Executive Order, the regulations of the Coast Guard were published in Title 33 of the Code of Federal Regulations, Part 121, instituting a screening program, entitled "Special Validation Endorsement for Emergency Service for Merchant Marine Personnel."

These regulations require all merchant seamen employed on vessels of the United States of a hundred gross tons or over to obtain special validation endorsement of their merchant mariner's documents. (33 C.F.R. § 121.01(a)). The Commandant is empowered to issue such validation endorsement upon a finding that "the character and habits of life of the applicant are such as to warrant the belief that his presence on board vessels of the United States would not be inimical to the security of the United States." (33 C.F.R. § 121.07). Information which "may" preclude a favorable determination includes, *inter alia*, "[m]embership in, or affiliation or sympathetic association with, any foreign or domestic organization, association, movement, group, or combination of persons designated by the Attorney General pursuant to Executive Order 10450, as amended." (33 C.F.R. § 121.01(e)). To obtain fuller information, the Commandant may require the applicant to answer written interrogatories. See 33 C.F.R. § 121.05(d).

If there is any question as to an applicant's eligibility for security clearance, the Commandant is to refer the matter to a Committee composed of representatives of the Legal Division, the Merchant Vessel Personnel Division, and the Intelligence Division of the Coast Guard. (33 C.F.R. § 121.05(e)). This Committee then prepares an analysis of the available information and makes a recommendation to the Commandant. If the Commandant then "is not satisfied" that the applicant is eligible for security clearance, he sends written notification to the applicant, who may then request a hearing. (33 C.F.R. § 121.07(b)). The hearing is conducted by a Board of three members, two of whom are civilian Labor and Management representa-

tives, and the applicant and the Government have the right to present whatever evidence they wish and to cross-examine fully. See 33 C.F.R. § 121.19. The Hearing Board then makes a recommendation to the Commandant who has the final power of decision. (33 C.F.R. § 121.21). If the Commandant's decision is adverse to the applicant, he may appeal to an Appeal Board composed of three members, two of whom are Labor and Management representatives. (33 C.F.R. § 121.23). The applicant has the right to an entirely new hearing upon such evidence as he wishes to present before the Appeal Board. (33 C.F.R. § 121.23). The Appeal Board then makes a recommendation to the Commandant who has the final power of decision. (33 C.F.R. § 121.25). The procedures here outlined were followed.

Plaintiff challenges both the *sufficiency of the evidence to support the Commandant's decision and the procedures employed*, urging that they deprived him of substantive as well as procedural due process.

■ Although we are called upon to review an administrative determination and the evidence supporting it, our jurisdiction is not under the Administrative Procedure Act (5 U.S.C.A. § 1009). It is undisputed that for two reasons at least the Administrative Procedure Act does not apply to the Commandant's determinations, first because the subject matter of the Act comes within the exception of Sections 1003 and 1004, as it concerns naval or military affairs; second, the Act does not require an adjudication to be determined on the record after opportunity for agency hearing under Section 1004 (Parker v. Lester, D.C., 112 F.Supp. 433; 9 Cir., 227 F.2d 708; 62 Yale Law Journal 1163; cf. Warren v. Arzt, D.C., 18 F.R.D. 11). The fact that plaintiff has exhausted his administrative remedies is in order to fulfill the requirements of Section 2201, 28 U.S.C.A. rather than those of the Administrative Procedure Act.

Our obligation in this suit is to examine the record to see that in reaching the decision which has been reached, the Federal constitutional guarantees of the plaintiff were fully observed.

■■ Plaintiff challenges the procedures employed in four respects. First, plaintiff argues that Section 121.19(K) of the Coast Guard Regulations is unconstitutional in that it authorizes the Board to reach a conclusion on the basis of secret information as well as information presented at the hearing, and that the Commandant did use just such information in reaching his decision, thus depriving plaintiff of the right of confrontation and of cross-examination. The argument—unsupported by the record and by logic—is that since the evidence at the hearing in plaintiff's opinion was not sufficient to support the Commandant's conclusion he must have relied on secret information to reach the decision he did. The Commandant's decision recites that it is "on the basis of the evidence adduced of record"; and his findings relate to that evidence, undisputed as it is on the whole. There is nothing to sustain an inference that any information not in the record was even known to the Commandant. Plaintiff has pointed to no finding which expressly or inferentially can be said to relate to any evidence not of record. The Hearing and the Appeals Boards—the recommendations of both of which the Commandant accepted—based their recommendations on the record, specifically referring to the evidence therein disclosed. The Appeal Board had before it the Commandant's statement of reasons for the original rejection, transcript of hearing and documentary evidence introduced and the Hearing Board's statement in support of its recommendation—in short the entire record up to that time. The recommendation of the Appeal Board recites that it is based entirely on the record of the hearing. It was on this record that plaintiff took his appeal and on which he now invokes the summary jurisdiction of this Court; he may not go outside of it, nor ask us to do so.

■ Plaintiff then contends that Sections 121.19(m) and 121.25 of the Regu-

lations, which direct the Hearing and Appeals Boards to forward their recommendations to the Commandant violate due process because they do not authorize that the applicant be furnished with a copy, and in fact he was not given a copy. There is no prohibition against furnishing such a copy; plaintiff never requested one, nor did he object to the failure to furnish him with one, although he had full opportunity to do so. Not only did he know of this procedure from the Regulations, but from the Hearing Board when it gave him an opportunity to submit a memorandum and advised him that it would submit a recommendation to the Commandant.

■ The argument advanced by plaintiff that it was essential that he be informed of the decision of the Board in order to know in what respect his evidence was deficient, whether secret evidence was considered and whether he should file an appeal, is answered by the fact that he does not urge any support for the claim that secret information was considered or that he had additional evidence affecting the charge against him he could or would have submitted, and that he did in fact take an appeal. The facts which underlay the recommendations were disclosed by the evidence at the hearing, and plaintiff had a copy of the hearing minutes. The Commandant's decision was based on the record and on the recommendations which were based on the evidence in this record. There was no reversal of the Commandant's position following receipt of the recommendations. The reasons he had set forth in support of his initial denial conveyed to plaintiff in writing were the same as those which supported his adherence to his initial decision after having received the recommendations. Plaintiff was therefore fully informed at all times of the charges he had to meet and the basis for the conclusion that he was not eligible for a validation endorsement. Moreover, the recommendations have now been furnished to him as part of the record, and he has pointed to nothing in them which would have been of help to him. The memorandum which he submitted to the Hearing Board, without having seen the recommendations, closely parallels the memorandum submitted here after having seen them. We may not presume injury to plaintiff from his failure to see the recommendations during the hearings, when now having seen them he can point to none.

■■ Due process requires that an accused be given notice of the charges made against him. This was fully and fairly done here, first by the letter from the Commandant setting forth his reasons for denying plaintiff's application; then by detailed interrogatories, which plaintiff could answer; then by the hearing at which plaintiff produced his own witnesses and confronted the accusing witnesses, and finally by the Commandant's decision detailing his findings. Plaintiff waived his right to a hearing on the appeal and for the opportunity to present further evidence and argument.

■ Plaintiff's third contention is directed to Sections 121.13 and 121.23 which provide for the establishment by the Commandant of a Hearing and an Appeal Board. It is difficult to understand plaintiff's point here that he was denied due process because this authority vested in the Commandant made him both prosecutor and judge.

There is no evidence that the Commandant himself did any prosecuting. The initial investigation under Section 121.05 (e) is made by Coast Guard personnel, who make a recommendation to the Commandant; up to this stage of the procedures the matter is solely within the Coast Guard. We view this as a normal and expected procedure for the agency faced with the necessity of making a decision as to an applicant's fitness to conduct its own investigation. From then on however, if the Commandant is not satisfied as to the applicant's fitness, the Coast Guard personnel, including the Commandant, have a different and minor role. The Board which hears the evidence (and its convocation is mandatory and not discretionary with the Commandant) under Section 121.13, is made

up of two men wholly unrelated to the Commandant or the Coast Guard, whose names are not even placed on a list by the Commandant, and a third person who, while employed by the Coast Guard, is an independently functioning civilian examiner. The names and the connections of the members of the panel are submitted ahead of time to plaintiff, who may challenge all or any for cause and peremptorily (Section 121.17) in which case alternate names are submitted to plaintiff. The Appeal Board is similarly constituted. The Commandant does not sit on either Board and he is not present at the hearing, or at the consideration of the appeal.

The fact that the recommendations of the two Boards coincided with the Commandant's initial determination that plaintiff was not eligible does not compel or lead to a conclusion that they were the Commandant's alter egos. The presence of the Civilian Examiner, is not a denial of due process. That the strict separation of functions imposed in judicial hearings is not required of administrative hearings is conceded by plaintiff. Plaintiff's attack is simply the general statement, with nothing to substantiate it, that since the Commandant's decision was not favorable to him it must have been based on bias.

Finally, plaintiff attacks the Regulations in their entirety on the ground that the Act does not expressly authorize a screening program and "no less one that is constitutionally defective."

■ The regulations are not constitutionally defective, but even if they were this would not mean that they were promulgated without warrant in law. Parker v. Lester, 9 Cir., 227 F.2d 708, United States v. Gray, 9 Cir., 207 F.2d 237. The Act expressly authorizes the President to institute such measures and issue such rules and regulations to carry out the purpose of the Act—which he did by Executive Order empowering the Commandant to take all necessary steps to insure the security of merchant vessels. . It was pursuant to this order that the regulations were published, but even

if they had not been expressly authorized, they would not be illegal so long as they were consonant with and necessary to carry out the provisions of the Act.

■ We conclude that the procedures employed in reaching the administrative decision afforded plaintiff all constitutional safeguards.

We now consider plaintiff's challenge to the final determination herein in its substantive aspect: (1) that there was no "lawful evidence" before the Commandant to sustain his finding under the Regulations that plaintiff's presence aboard ship would be "inimical to the National Security", (2) that the Coast Guard Regulations are unconstitutional on their face and as applied because they punish "guiltless knowing behaviour", and (3) that the Coast Guard Regulations are unconstitutionally vague.

■ In the face of the undisputed finding of plaintiff's membership in the Communist Party, his first argument is that the evidence has failed to show that degree of knowledge and activity sufficient to constitute his membership "active and knowing" in the sense that the individual knew of and participated in the Party's illegal activities (Scales v. United States, 37 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 and Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836). From this he argues that the Commandant deprived him of his right to work on the basis of mere membership and that the regulation under which the Commandant was authorized to do this is unconstitutional.

It is absolutely clear from a reading of the Commandant's decision that he found much more than "mere membership which terminated 8 years ago" (as plaintiff states it). Our only question is whether the evidence substantiates the finding; we hold that it does. We have already reviewed the evidence in the record and taken as a whole we cannot say that it was unreasonable to find and conclude that plaintiff knew of the purposes of Party and was committed to

these purposes and displayed this commitment by extended membership in the Party and continuous activities on its behalf (Aptheker v. Rusk, Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992).

Against the background of his admitted membership in the Party for a period of at least 20 years and probably 24, we have at the outset plaintiff's testimony that, while a Party member he knew that the Party advocated overthrow of the present form of government of the United States, and that it advocated and taught that "Russia would become the Communist Party State; that Capitalism is a dying society."

There followed then the fact that as an illiterate poor Negro from the South he received his only formal education at the hands of the Party for a period of two years—through personal teaching by Party members and attendance at Jefferson School, the training school for the Party—and was indoctrinated into Party purpose and policy; his employment at the National, State and County Headquarters for 11 years as an elevator operator—a position which required membership in the Party—and one which though humble would bring him into personal contact with the Party functionaries; his regular attendance at the meetings of his branch as well as at the National Conventions; his membership in the Waterfront Section of the Party; his open loyalty to the Party position in our involvement in the Korean War, to which the Party was opposed; and his employment by the Party to organize peace demonstrations. There is also his political activity on behalf of the Party notably his signature on nominating petitions for election to political office of convicted Communist leaders. There is the evidence of his concealment of membership in the Communist Party in the sworn questionnaire sent him by the Coast Guard in connection with his application for the validation of his documents, but the disclosure of his membership in the IWO; this was followed by his concealment and falsification of the

length of time he was a member in the Party (—in the sworn statement to the interrogatories—giving the dates of 1938 through 1950, and his third sworn statement at the hearing that he was such a member from 1936 to 1957). Even this last testimony that he had left the Party in 1957 was contradicted by the fact that he remained employed at Headquarters until 1960 (which employment required membership in the Party). It was further contradicted by the reason he advanced for leaving it in 1957—that the Party was not interested in the Negro cause—it having been plaintiff's testimony that he had first become disenchanted with the Party in this respect as early as World War II, and then again in 1951, but had done nothing about his disenchantment until 1957. Moreover, there was absolutely no evidence that as a Negro—who had allegedly joined and been very active in the Party solely to help the Negro cause—he had done anything in the field of Negro rights through other organizations. The testimony of his two witnesses cast not a shadow of doubt on this aspect of the evidence, in fact his witness Woodhead thought plaintiff had left as early as the 1940's. Even the reason for plaintiff's claimed disillusionment with the Party and his breach with it was not that he disavowed its purposes, with which he had testified he was acquainted, but that it did not help the Negro. There was no evidence that he had ever expressed dissatisfaction or disagreement with the Party's illegal purposes—even after his alleged breach.

The Commandant's conclusion that plaintiff had not left the Party in 1957 and that he continued to be "a member of or knowingly and sympathetically associated and affiliated with the C. P." was fully warranted on the evidence.

Plaintiff's further argument, is that all the activity shown to have been engaged in by him was lawful and constitutionally protected—encompassing as it did freedom of assembly, of speech, of press and to vote—and that it could not lawfully be used to deprive plaintiff of

his further protected right to work. Plaintiff contends also that it is not alone the quantity of activity which denotes active membership, but also its quality—which must be that of someone "high in the councils of the Party"—(Scales v. United States, supra, 367 U.S. 254, 81 S.Ct. 1469)—which plaintiff a mere rank and filer was not, and that since there was no link between plaintiff and the Party's illegal activities his was "a guiltless membership" which may not be "arbitrarily" punished.

There was no evidence that plaintiff was directed to, or did engage in illegal activity on behalf of the Party—just as there was no evidence that he was directed to and refused to obey. There was evidence that he was directed to and did perform a variety of activities, from organizing peace demonstrations to setting up tables—more in keeping with his position as a rank and file member, than as a leader.

It is obvious that as a rank and file member aboard a vessel he would be just as capable as a functionary, if directed to, of endangering the security of the vessel, or the harbor through sabotage, delays or obstructions—all of which might be accomplished through peaceful means. That he never did, is no answer. If he took directions and acted on Party orders to organize a peace rally when this country was at war against Communism in Korea and did not do so as his own free act and decision the Commandant could reasonably find that he might just as easily follow Party directions and orders to hinder or obstruct the sailing of a vessel with emergency materials, in some other war.

Besides there is a tremendous and substantial difference between the activity required to be proved for a Smith Act conviction, under Noto and Scales, and the degree of activity within the Communist Party which might constitute reasonable grounds for barring a seaman from a vessel as a security risk. The one is directed to teaching and advocating and inciting to violence; the other need be simply a loyalty and willingness

to carry out orders of an organization which might endanger the security of this country's vessels and harbors whether by violent or peaceful means. To say that plaintiff's right to work on a ship may not be interfered with until it has been shown that he has engaged in some prior illegal activity on behalf of the organization is to say that a security program may not employ reasonable preventive measures but must wait until the harm sought to be protected against has been done. The purpose of the screening program was to secure vessels, shipments and waterfront facilities from potential as well as actual danger and any regulation reasonably related to this purpose is lawful (Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956).

We conclude that the denial of security clearance as a merchant seaman to one who held meaningful membership for over 20 years in the Communist Party was a valid application of the Coast Guard Regulations, since it might reasonably be assumed that such a person might "engage in activities inimical to the security of the United States" (Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961)).

Plaintiff's next contention is that the Sec. 121.03(e) of the Regulations is unconstitutional as applied to him and on its face because it permits "bare" membership in the Communist Party to bar him from his calling and because its terms are vague. The Section reads,

> "[m]embership in, or affiliation or sympathetic association with, any foreign or domestic organization, association, movement, group or combination of persons designated by the Attorney General pursuant to Executive Order 10450, as amended * * *."

His point that as applied to him the section is unconstitutional is disposed of by our finding that the Commandant in making his decision barring plaintiff

under the Regulation properly construed the Regulation as requiring knowing membership. The Commandant's decision on the evidence found that plaintiff was "a member of the Communist Party" (No. 1) and "knowingly and sympathetically associated and affiliated with the Communist Party" (No. 2); and was "well indoctrinated in and fully realized, accepted and approved the aims and objectives of the Communist Party including the overthrow of the present form of Government in the United States by force and violence and Communist domination of the World." It was this evidence of membership in the Party and continued affiliation and association as provided in the Regulation which manifestly led the Commandant to conclude that plaintiff's presence would be inimical to the security of the United States.

The Commandant's interpretation of the Regulation was perfectly consonant with its language. There is nothing in the words "membership, affiliation or sympathetic association" which precludes an interpretation that it must be knowing or active. We have been pointed to no other construction placed on this language by the Commandant on other occasions or by other courts, and to no internal directives or opinions of counsel which would require a construction of mere membership, affiliation or association without more. There is absolutely no warrant for this Court's so limiting the language. The Regulation here is completely different from that which the Court struck down in Aptheker v. Rusk, supra. For the same reasons we hold that it is not unconstitutionally vague. Knowing membership, knowing affiliation or knowing sympathetic association as applied here are inconsistent with innocent or indifferent affiliation or association. Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377; Cramp v. Bd. of Public Instruction of Orange County, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285. We find it unnecessary to anticipate a situation which may never arise and which is certainly not

before us. The Regulation is valid because it is open to such a construction without doing it violence in any way.

■ Plaintiff also attacks the Regulation on the ground that it permits reliance on the Attorney General's list, and the use of such evidence by the Commandant citing Joint Anti-fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817.

First things first. McGrath was decided under an Executive Order which following that decision was superseded by the present order, (to cure the defect that it provided for no hearing before listing) but the authority of the Attorney General to maintain such a list was unquestioned. Secondly, even under McGrath only the organization listed could directly attack the listing (National Lawyers Guild v. Brownell, 96 U.S.App.D.C. 252, 225 F.2d 552).

The real answer to this afterthought is given by plaintiff himself when he points out that the difference between the use of the list in McGrath and here, is that in the former the list was used to establish a presumption while here it is used only as an element of evidence from which an inference ultimately may be drawn. Thus, the Commandant considered plaintiff's attendance at the Jefferson School and two Communist Camps, as well as his participation in the May Day Parade and his membership in the IWO—all on the Attorney General's list—to establish along with other evidence plaintiff's knowing and active membership in the Communist Party— which was the basis for the conclusion reached. The Commandant did not use plaintiff's membership or activities in these other organizations as conclusive or presumptive evidence that plaintiff would endanger the security of shipping. The use made even if plaintiff could collaterally attack it, was not illegal.

Nor does the Regulation create any presumption of disqualification from this list, but rather says that such information may be considered, which is what the Commandant did.

We conclude that the Commandant's decision on the basis of the record that he was not satisfied that plaintiff's presence on board vessels of the United States would not be inimical to the national security was fully consonant with the Constitution—as were the procedures employed in reaching the decision. The Commandant reasonably and properly concluded that plaintiff, long subject to Party discipline, could not be permitted with national safety to work on board United States Merchant Vessels.

Plaintiff's motion for summary judgment is denied and judgment is entered for defendant dismissing the complaint; the Clerk is directed to enter judgment accordingly forthwith.

So ordered.